The STATE of Ohio, Appellee,

v.

KITCHEN, Appellant.

[Cite as *State v. Kitchen* (1998), 128 Ohio App.3d 335.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 97–CA–20.

Decided June 12, 1998.

336

*G.S. Weithman,* for appellee.

*Brad C. Singer,* for appellant.

BROGAN, Judge.

Phillip E. Kitchen appeals from a judgment of the Champaign County Municipal Court convicting him of contempt. Kitchen argues that the court's action holding him in contempt was an abuse of discretion and that his conviction was against the manifest weight of the evidence. We conclude, however, that the court acted within its discretion when it found Kitchen in contempt and that its findings were supported by the weight of evidence. Accordingly, we affirm.

## I

The facts of this case are as follows. Phillip E. Kitchen was charged with two counts of domestic violence in violation of R.C. 2919.25, one count of disorderly conduct in violation of R.C. 2917.11, and one count of criminal trespassing in violation of R.C. 2911.21. The charges arose from an incident in which Kitchen appeared at the house of his ex-wife and tried to get his children to accompany him to a funeral. At his arraignment, the trial court found Kitchen indigent and appointed an attorney to represent him. The court scheduled a jury trial for July 11, 1997. By that date, the state had dropped the two charges of domestic violence against Kitchen.

On the day of his trial, Kitchen fired his court-appointed attorney after a disagreement regarding trial strategy. The particular cause of the disagreement involved Kitchen's demand that his attorney subpoena a dozen witnesses that his attorney had chosen not to pursue. Also, Kitchen wanted his attorney to file a

motion for the trial judge to recuse herself, and the attorney refused. Kitchen's argument with his attorney occurred just outside the courtroom within the hearing of some of the veniremen. As a consequence of firing his attorney, Kitchen represented himself during voir dire and during the trial itself. After voir dire was completed, Kitchen asked the court for a continuance in order to subpoena more witnesses. The trial court denied the motion.

During Kitchen's opening statement, the trial court declared a mistrial upon the prosecution's motion. The court then found Kitchen guilty of contempt of court and sentenced him to thirty days in jail, with twenty-three days suspended, and a fine of $20.

On July 23, 1997, Kitchen appeared before the trial court and pleaded no contest to one count of disorderly conduct. The trial court found him guilty and sentenced him to thirty days in jail. His sentence was suspended on the condition that he not conduct himself in a similar fashion for two years and that he obtain written permission before visiting his children.

Kitchen now appeals from his conviction for contempt.

## II

Kitchen raises two assignments of error on appeal, both relating to the propriety of the trial court's finding of contempt. The assignments of error are as follows:

"I. The trial court's conviction of defendant-appellant for contempt of court was against the weight of the evidence.

"II. The trial court's conviction of defendant-appellant for contempt of court was an abuse of discretion."

The court's contempt finding followed a number of attempts by the court to force Kitchen to refrain from making remarks that might prejudice the jury in his favor. The following excerpts from the trial transcript represent these various attempts. The first occurred during voir dire:

"MR. KITCHEN: And can they [the veniremen] be excused for certain reasons or someone that I can excuse? I'm just a layman, I don't understand the law. I'm forced to defend myself.

"[Prosecutor]: Your Honor, that we're going to ask that that be stricken, the fact that he is forced to represent himself.

"THE COURT: The Court is going to strike it. We'll take a brief recess if the jury—if the bailiff would lead the jurors out. We'll take about a five minute recess.

"Mr. Kitchen, you're not forced to represent yourself. And those kinds of comments are going to stop in the presence of the jury. * * *"

The next incident occurred at the beginning of Kitchen's opening statement.

"THE COURT: Mr. Kitchen. Opening?

"Mr. KITCHEN: First, Your Honor, I would like to ask the court to grant me some leniency since I don't know how to practice law. I've been in a—

"THE COURT: Mr. Kitchen, if you and the prosecutor would approach the bench. Yeah. [An unrecorded side-bar conference occurs here.]

"Opening statements, Mr. Kitchen.

"Mr. KITCHEN: My Name is Phillip Kitchen and I am the defendant in this matter. I have to take my time and try to be careful of what I say. I'm trying to come up with the words, I'm a little, I'm really, really, nervous. I just don't know what I am going to say that is going to get me in trouble and what's not going to get me in trouble.

"[Prosecutor]: Your, Honor, may we approach the bench?

"THE COURT: You may. [Unrecorded side bar.]

"The court would instruct the jury to disregard any insinuation that Mr. Kitchen being forced to have a jury—or not to have an attorney, thank you. You may go forward.

"MR. KITCHEN: I am Phillip E. Kitchen and I am the Defendant in this case. And I'm sorry I can't be cordial to you all, but I do intend to prove that on that date, May 19, 1997.

"[Prosecutor]: Excuse me, Your Honor, may we approach the bench again?

"THE COURT: Yeah. [Unrecorded side bar]

"The jury will disregard the Defendant's comment that he cannot be cordial, thank you."

The court's finding of contempt then followed the following incident, which occurred at the end of Kitchen's opening statement:

"MR KITCHEN: * * *

"I don't mean to come in hear to look like a lawyer. I want to wear a shirt and tie to show some respect for the Court and for all you jurors, for all of you people coming in here. I don't—it is not usually dress it is not my usual attire, but it is just my way of showing respect for you all and for the Court. And I don't usually carry a briefcase neither, but that's—I have a lot of necessary papers in there and it's just my way of organizing I don't mean to show you something that I'm not. I'm just a simple person just like I believe most of you are.

"* * *

"I don't mean to if I do make this an emotional circus or turn it into anything more than what it is and all I want is for the truth, the whole truth and nothing but the truth to come out. An I've been offered—

"[Prosecutor]: Your Honor, may we approach the bench?

"THE COURT: You may. [Unrecorded side bar.] You may proceed.

"MR. KITCHEN: I think when the jury hears all of the evidence and I'm sorry I can't look at you all of the time, I don't mean to be rude, but I have to read this and this is hard for me. But when the jury sees all of the evidence, they'll realize that I am not guilty of disorderly conduct or criminal trespass and they'll find out and they'll know that I am a good, loving father to my children and should have all of these charges which I believe to be frivolous charges and selective prosecution charges—

"[Prosecutor]: Excuse me, Your Honor, may we approach the bench again?

"THE COURT: You may. [Unrecorded side bar.] You may go on.

"MR. KITCHEN: I guess I'll close my beginning statement for now. Except for one thing what I did mean about the selective prosecution is I didn't mean—

"[Prosecutor]: Excuse me, Your Honor, excuse me, Your Honor, may we approach the bench.

"THE COURT: Yeah. [Unrecorded side bar.] We'll take a five minute recess."

In recess, the prosecution moved for a mistrial on the grounds that Kitchen had continually played on the sympathy of the jury for his lack of an attorney even after, in side bars, the court had ordered him not to do so. The prosecution also objected to Kitchen's statement that he was being selectively prosecuted. The trial court then granted the motion and found Kitchen in contempt.

During the recess, the court explained its finding of contempt in these terms:

"THE COURT: The court has had numerous side bars with you. You've had an opportunity to have an attorney who is sitting right beside you now, you have made the choice not to, over and over again I've listened to you insinuate and try to invoke the sympathy of the jurors because you don't have legal experience or the expertise. You've been warned about it and you continued right on.

"You insinuated that you are forced to go to trial to the jury. You were warned about it. You have accused the prosecutor of saying falsities.

"You have inappropriately said that you will prove something to the jury. You've got the burden of proofs wrong. You brought up the fact that there is jail

.time involved with these offenses. You tried to discuss or were about to discuss plea bargaining regarding offers of settlement and compromise.

"You again tried to invoke the sympathy of the jury or arouse their passion over and over by virtue of your being such a good, loving father. And finally, you were warned about the selective prosecution and you were told at the bench do not say that again, and you went right back to your table beside your attorney and once again you brought up selective prosecution.

"Now from the minute you arrived at this Court, which by the way was fifteen minutes late, it would appear to the Court as though, you know, there is some kind of self sabotage going on with this trial. And you've been warned that it's not going to be tolerated in this Court.

"First, I'm going to find that you are in contempt and I am going to sentence you to thirty days in jail and fine you twenty dollars plus court costs.

"Second, I am going to declare a mistrial. Let's set another trial date."

The issue before us, then, is whether, in light of this record, the trial court overstepped its authority to hold Kitchen in contempt.

Municipal courts have statutory authority to punish contempts in any action over which they have jurisdiction. See R.C. 1901.13(A). They also have inherent authority to punish contempts committed in the presence of the court that obstruct the administration of justice. See 17 Ohio Jurisprudence 3d (1980) 331, Contempt, Section 13.

▪ ██ The propriety of imposing punishment for contempt often turns on whether the contempt is direct or indirect, and on whether it is civil or criminal in nature. R.C. 2705.01 governs direct contempt, which the Revised Code defines as "misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice." See, also, *State ex rel. Seventh Urban, Inc. v. McFaul* (1983), 5 Ohio St.3d 120, 122, 5 OBR 255, 257, 449 N.E.2d 445, 447. The statute permits a court to punish a direct contempt summarily, and due process does not require that the contemnor be granted a hearing. *In re Purola* (1991), 73 Ohio App.3d 306, 312, 596 N.E.2d 1140, 1144. Indirect contempt, on the other hand, is committed outside the presence of the court and requires an adversarial hearing to determine guilt. See R.C. 2705.03; *In re Lands, Lots or Parts of Lots Omitted from Foreclosure Proceedings–1944* (1946), 146 Ohio St. 589, 595, 33 O.O. 80, 82–83, 67 N.E.2d 433, 437.

██ The distinction between civil and criminal contempt is based on the character and purpose of the sanction. *Denovchek v. Trumbull Cty. Bd. of Commrs.* (1988), 36 Ohio St.3d 14, 16, 520 N.E.2d 1362, 1364–1365. Civil contempt seeks to induce compliance in the contemnor. See *Catholic Social Serv.*

*of Cuyahoga Cty. v. Howard* (1995), 106 Ohio App.3d 615, 619, 666 N.E.2d 658, 661. In contrast, the purpose of criminal contempt is to punish defiance of a court's authority. *Id.* Civil contempt generally results in a conditional sentence or fine that may be avoided if the contemnor complies. Criminal contempt, conversely, usually gives rise to an unconditional fine or sentence. See *id.*

In the instant case, the actions leading to Kitchen's contempt charge occurred either in the courtroom or just outside the courtroom. The sanction imposed by the court was an unconditional sentence resulting from Kitchen's disruptive behavior. The citation for contempt in this case, therefore, was for a direct, criminal contempt.

A court may punish conduct as a direct contempt only if that conduct constitutes misbehavior that poses an imminent threat to the administration of justice. *Howard,* 106 Ohio App.3d at 619, 666 N.E.2d at 661. Generally, the finding that such conduct constitutes contempt is within the discretion of the trial court. *Id.* Nevertheless, when the contempt is criminal, evidence of guilt must be beyond a reasonable doubt. *Brown v. Executive 200, Inc.* (1980), 64 Ohio St.2d 250, 18 O.O.3d 446, 416 N.E.2d 610, syllabus. We note, however, that this court has held that, when contempt is committed in the presence of the court, intent is not a necessary element of the crime, and a court need not consider the intent of the contemnor in the summary procedures permitted by statute. *Univis Lens Co. v. United Electrical Radio & Machine Workers of Am., CIO* (1949), 86 Ohio App. 241, 242, 41 O.O. 158, 158–159, 89 N.E.2d 658, 659–660. Thus, to find direct criminal contempt a court need only determine, beyond a reasonable doubt, that the contemnor's actions obstructed the administration of justice.

Here, Kitchen's behavior resulted in a mistrial. There is also no question that his attempts to portray himself as the victim of an unfair process were improper, and they were repeated even after the court ordered him to cease. Under these circumstances, we cannot see that the trial court abused its discretion in finding that Kitchen obstructed the administration of justice. Thus, the finding of contempt was not an abuse of discretion.

Nevertheless, Kitchen argues that his behavior resulted from the trial court's unreasonable denial of his motion for a continuance. The court refused him a continuance, he argues, even though he was unprepared to present a defense. Thus, he contends, his behavior was not objectionable. Generally, however, when a court acts within its authority, even those orders constituting reversible error must be followed. *State v. Christon* (1990), 68 Ohio App.3d 471, 475, 589 N.E.2d 53, 55–56. Thus, even if we agreed with Kitchen that the court should have granted him a continuance, we could not find that Kitchen was licensed to act as he did from that point forward. Moreover, given the lateness of

the request—after the jury was selected and voir dire completed—the trial court's decision to proceed with the trial fell within its sound discretion. See *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080 ("Weighed against any potential prejudice to a defendant are concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.").

Finally, Kitchen asks us to review his contempt conviction to see whether it was against the weight of the evidence. Because Kitchen was punished for a criminal contempt, we presume that the standard announced by the Supreme Court in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, governs our review of this question. In *Thompkins,* the Supreme Court held that, when an appellate court reviews the weight of evidence supporting a criminal conviction, it may reverse if it disagrees with the factfinder's determination. *Id.* at 387, 678 N.E.2d at 546–547. The standard adopted by the Supreme Court requires an appellate court to review all of the evidence in the record and determine whether the trial court lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. See *id.,* citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 218–219, 485 N.E.2d 717, 720–721.

■■■ Applying this standard, we note that some deference is still due to a trial judge's determination that misbehavior occurring in her presence constituted contempt. A transcript cannot convey the full effect of a party's misbehavior or the full impact that the party's actions have had on the orderly administration of justice. In the instant case, important events leading up to the contempt finding occurred before the proceedings began—particularly Kitchen's firing of his attorney in the presence of the veniremen. Given the limitations of the appellate record, we are not in the same position as the trial court to gauge the full force of Kitchen's misbehavior or its effect on the jury. Thus, as a practical matter, we must grant considerable deference to the trial court's determination that Kitchen's actions constituted misbehavior obstructing the administration of justice.

We also note that a number of important side-bar discussions, in which the trial court apparently warned Kitchen about his behavior, were not recorded in the transcript. We are convinced that the better procedure would have been to record these conferences so that they might be preserved for appellate review. Had these conferences been recorded, the propriety of the court's contempt finding may have been more apparent.

Nevertheless, on the record before us, giving due deference to the trial court's determination, we are unable to say that Kitchen's citation for contempt constituted a manifest miscarriage of justice. Thus, we do not find it was against the weight of the evidence.

In accordance with the foregoing, appellant's two assignments of error are overruled. The trial court's finding of contempt is affirmed.

*Judgment affirmed.*

FREDERICK N. YOUNG, P.J., and FAIN, J., concur.