A11A0309, A11A0310. NEWTON v. GOLDEN GROVE PECAN FARM et al. (two cases).

(711 SE2d 351)

BLACKWELL, Judge.

Following a hearing on August 2, 2010, the court below adjudged Salina Newton, a court-appointed receiver, guilty of criminal contempt, a judgment based on findings that Newton, several months before the August hearing, exercised her authority as receiver in a way that was contrary to the known directions of the court and that she and her lawyer, in the course of the August 2 proceedings, engaged in contemptuous conduct. Newton appeals from this judg-

ment of contempt.[1] With respect to the finding of contempt based on the way in which Newton performed her duties as receiver before the August 2 hearing, we conclude that the court below was required to give Newton fair notice and a reasonable opportunity to prepare a defense before it could try her for such contempt. Because the court did not do so, we must vacate the judgment of contempt to the extent it is based on anything that occurred before August 2. As to the finding of contempt based on conduct occurring in the course of the August 2 proceedings, we conclude that, although the court below was entitled to adjudicate any such contempt summarily and without advance notice, there is nothing in the record to sustain the finding that Newton or her lawyer did or said anything contemptuous. Accordingly, we reverse the judgment of contempt to the extent it is based on anything that occurred at the August 2 hearing.

Pursuant to the forfeiture provisions of the Georgia Racketeer Influenced and Corrupt Organizations Act, OCGA § 16-14-7, prosecutors commenced civil proceedings in September 2009 to forfeit certain properties owned by Michael K. and Phyllis M. Bleckley, which were located in Stewart and Webster Counties. In their civil filings, the prosecutors alleged that the Bleckleys obtained approximately $3.4 million from investors by means of fraud and then used the money to purchase the properties that are the subject of the forfeiture proceedings. The prosecutors also asked the court below to appoint a receiver for these properties while the forfeiture proceedings were pending, and the court below agreed, appointing Newton. Under the terms of the receivership order, Newton was authorized to take possession and control of the properties in Stewart and Webster Counties, which included two pecan orchards, a funeral home, and several automobiles. Newton also was expressly authorized to, if appropriate, "file for relief and protection under the Federal Bankruptcy Code on behalf of [the properties]."[2]

After Newton was appointed as receiver, Central Bank of Georgia, which claimed to have a valid security interest in some of the

---

[1] Newton had been appointed receiver in one case by the Superior Court of Stewart County and in a companion case by the Superior Court of Webster County. Each county is a part of the Southwestern Judicial Circuit. On August 2, the court below was sitting as the superior court of both counties, and the court entered an order of contempt in each of the companion cases. These orders are identical, both orders are based on the same underlying conduct, and Newton appeals from both orders. We consolidated her appeals from these orders, and for the ease of our discussion, we refer herein to the "court below" and the "contempt order," as if there were only one of each. By these references, however, we mean to refer to the superior courts of both counties and to the orders of each court. There is no reason in this appeal to distinguish between the two courts and the two identical contempt orders.

[2] Prosecutors also commenced proceedings in Meriwether, Troup, and Marion Counties to forfeit other properties owned by the Bleckleys, and Newton also was appointed as receiver by superior courts of those counties.

properties, asked the court below for a "status hearing," and the court convened such a hearing on April 13, 2010. At this status hearing, the court below apparently gave some direction about the receivership—the alleged disregard of which is the basis for some of the contempt findings—but we do not know exactly what was said at this hearing because it was not transcribed. We do know that Newton attended the April 13 hearing, as did her lawyers, lawyers representing Central Bank and the Bleckleys, a prosecuting attorney, a police detective, and a lawyer representing the alleged victims of the investment fraud that gave rise to the forfeiture proceedings. When, several months later, the court below tried to ascertain what had occurred at the April 13 hearing, these attendees had varying recollections of what had transpired, some recalling that the court indicated on April 13 that it intended to dissolve the receivership altogether, and others recalling that the court indicated that it would modify the receivership by removing certain properties from it.[3] The court itself recalled that it had dissolved the receivership at the April 13 hearing or at least announced its intent to do so. In any event, no written order followed the April 13 hearing that dissolved or modified the receivership.

On April 30, Newton filed several petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Georgia, and the various properties of the Bleckleys that originally had been put into receivership, both in Stewart and Webster Counties and elsewhere, became part of the bankruptcy estates. Newton ostensibly filed these bankruptcy petitions because she thought it was impractical and inefficient to manage the various properties in receivership under the supervision of superior courts in five different counties and because she thought that she could better manage the properties through a unified custodianship under the supervision of a single bankruptcy court. Newton apparently did not seek guidance from the court below at the April 13 hearing about a potential bankruptcy filing, nor did she do so at any other time before she filed the bankruptcy petitions on April 30. Instead, Newton relied exclusively on the authority to make such filings contained in the original order appointing her as receiver, which, as of April 30, had not been revoked by any written order of the court below.

On June 15, 2010, the Bleckleys sought an injunction from the

---

[3] Lawyers for Central Bank and the Bleckleys, for instance, recalled that the court dissolved the receiverships at the April 13 hearing or at least indicated its intent to do so, but the prosecuting attorney, the police detective, lawyers for Newton, and a lawyer for the alleged victims recalled that the court indicated its intent to remove certain properties from receivership, but otherwise left the receivership intact.

court below that would prohibit Newton from disposing of certain properties that originally had been a part of the receivership, and on the same day, the court below entered a temporary restraining order that purported to enjoin Newton from doing just that. Newton responded to this order six days later, when she filed a plea of stay, in which she notified the court below of the earlier filing of the bankruptcy petitions and noted that, absent an order of the bankruptcy court allowing relief from the automatic stay, the court below was without jurisdiction to make orders concerning the property of a bankruptcy estate. Apparently in response to the plea of stay, the court below issued an order on June 24, nunc pro tunc[4] to April 13, that purported to remove Newton as receiver.[5]

Nearly a month later, the court below entered a notice, which was served on both Newton and her lawyer, that the court would hold a "status conference" on August 2, 2010. Nothing was mentioned in the notice about contempt, and nothing in the record indicates that the court below gave any other notice of the purpose of this "conference" prior to its commencement. But at some point during the "conference," the court below raised the possibility that, in light of the direction that was given at the April 13 hearing, Newton might have acted contemptuously.[6] The court then commenced summary contempt proceedings and found that, when Newton filed the bankruptcy petitions on April 30, she acted in defiance of the direction given at the April 13 hearing and thereby "subvert[ed] the will of the [c]ourt." The court also found that, by engaging counsel to prepare and file the bankruptcy petitions, Newton wasted the assets of the

---

[4] Nunc pro tunc, the literal translation of which is "now for then," signifies an order that is entered at a later date to formalize something that occurred or that was directed on, and is effective as of, an earlier date. See Black's Law Dictionary at 1069 (6th ed. 1990).

[5] Newton asserts in her brief that the court below erred in issuing the June 24 order, but Newton does not mention the removal order in her notices of appeal, nor does the trial court reference the June 24 order in its later finding that Newton acted in contempt of court. Nevertheless, we note that, although the court below indisputably had authority to remove its receiver prior to the filing of bankruptcy petitions on April 30, the bankruptcy filing effectively converted any receivership to a custodianship, which then was under the exclusive jurisdiction of the bankruptcy court. *Pimper v. State of Ga.*, 274 Ga. 624, 625-626 (555 SE2d 459) (2001). To the extent that any order entered after the commencement of bankruptcy proceedings was intended to affect the custody, control, possession, or disposition of any property that then was a part of a bankruptcy estate and, therefore, subject to the automatic stay, the court below exceeded its authority, and the order would be void. Id.

[6] The first mention of contempt that we find in the record is at page 54 of the transcript of the August 2 proceedings, when the court below said:

And—and I think it's pretty clear, if an order—if the Court's order of April 13th had been entered as directed by the Court, and as the receiver—my receiver—was aware of that order and she contradicted that order by subverting the wishes of the Court by going into a bankruptcy to prevent the jurisdiction of this Court—and I don't know that it necessarily did—then I think that might very well be a contemptuous act.

receivership. In addition, the court expressed concerns about arguments pressed at the August 2 hearing by the lawyer representing Newton, and it found that Newton, at the August 2 hearing, had continued to defy the direction given at the April 13 hearing.

The court adjudged Newton guilty of "direct, indirect, [and] summary contempt." Neither at the hearing nor in its later written order did the court specifically identify the conduct that it found to be direct contempt, the conduct that it found to be indirect contempt, or the conduct it found to be "summary" contempt, but we nevertheless think that we understand in general terms the basis for each.[7] Based on its adjudication of contempt, the court below sentenced Newton to pay a fine of $500 as to each of the companion cases and to be incarcerated for five days. The court also invited Central Bank, the Bleckleys, and any other party that might have been injured as a result of the purportedly contemptuous conduct to submit an affidavit detailing their attorney fees and costs, so that the court could require Newton to reimburse them. Newton filed notices of appeal as to the findings of contempt in each of the companion cases, and these consolidated appeals follow.

1. We turn first to whether the court below erred when it summarily adjudged Newton guilty of contempt based upon her conduct prior to the August 2 hearing, namely the preparation and filing of bankruptcy petitions in April. We note that there is some doubt about whether the contemptuous conduct of a court-appointed receiver in her capacity as receiver is properly characterized as direct or indirect contempt.[8] If it properly is characterized as indirect contempt, as we think the court below characterized it, the law is clear that Newton was entitled to reasonable notice of the contempt

---

[7] A court usually is authorized to summarily adjudicate contempt only in cases of direct contempt, *Ramirez v. State*, 279 Ga. 13, 14 (2) (608 SE2d 645) (2005), so we understand the references by the court below to "direct" and "summary" contempt to refer to the same thing. Direct contempt is generally understood to mean contempt in the presence of the court. Id. Indirect contempt, on the other hand, is generally understood to mean contemptuous conduct occurring outside the presence of the court. Id. Accordingly, we understand the references to "summary" and "direct" contempt to refer to conduct at the August 2 hearing, and we understand the reference to "indirect" contempt to refer to earlier conduct that occurred outside the courtroom.

[8] There is some authority for the proposition that anything contemptuous that a court-appointed receiver does in her capacity as a receiver might properly be characterized as a direct contempt since the official acts of one who draws his authority from the court are, in a sense, done in the presence of the court. See *Evans v. White*, 178 Ga. 262, 263 (172 SE 913) (1934). But we think the court below did not characterize the conduct occurring before August 2 and outside the courtroom as direct contempt because, if it had, we see nothing else that even arguably might form a basis for the finding of indirect contempt. Accordingly, we understand that actions taken by Newton as receiver—but prior to August 2 and outside the courtroom—were the basis for the finding of indirect contempt in the court below. For reasons explained herein, we need not resolve definitively whether the conduct of Newton before August 2 is properly characterized as direct or indirect contempt.

charge before the commencement of the contempt hearing, so that she would have an adequate opportunity to prepare and present a defense to the contempt charge:

> [W]here the alleged contumacious acts are committed outside the court's presence, the considerations justifying expedited procedures do not pertain. Thus, summary adjudication of indirect contempts is prohibited, and due process requires that a person who is tried for indirect criminal contempt is entitled to more normal adversary procedures. Among other things, he or she must be advised of charges, have a reasonable opportunity to respond to them, and be permitted the assistance of counsel and the right to call witnesses.

*Ramirez v. State*, 279 Ga. 13, 15 (2) (608 SE2d 645) (2005) (citations and punctuation omitted); see also *Dowdy v. Palmour*, 251 Ga. 135, 142 (2) (c) (304 SE2d 52) (1983) (holding that party sought to be held in contempt must be given "reasonable notice of the specific charges and [an] opportunity to be heard"). Here, the notice of hearing indicated only that the court intended to conduct a "status conference" on August 2, and no mention was made of contempt until the hearing was underway. See note 6, supra. Newton did not have time to employ a lawyer specifically to defend her against the contempt charges,[9] to discuss the case with such a lawyer, or to consult with a lawyer about witnesses or evidence that might be presented in her defense. She timely objected to the absence of advance notice and her resulting inability to adequately prepare a defense. As a result, we cannot conclude that what originated as a "status conference" and developed into a summary contempt hearing complied with due process. See *Ramirez*, 279 Ga. at 16 (3).

Even if the preparation and filing of the bankruptcy petitions by the receiver might be more properly characterized as direct contempt, we still think that the court below was not entitled to adjudicate it summarily and without advance notice. Although a direct contempt often may be addressed summarily, that is so only because, "[w]here misconduct occurs in open court, the affront to the court's dignity is more widely observed, justifying summary vindication." *Ramirez*, 279 Ga. at 15 (2) (citation and punctuation omitted). That is, summary adjudication is warranted when a

---

[9] While Newton was represented by counsel at the "status conference," her lawyer acknowledged to the court below that he was a bankruptcy lawyer and that he would prefer to defer legal questions related to the contempt charge to lawyers who had experience in that area.

contempt "threaten[s] a court's immediate ability to conduct its proceedings." Id. at 16 (3) (citations and punctuation omitted); see also *Pounders v. Watson*, 521 U. S. 982, 988 (117 SC 2359, 138 LE2d 976) (1997) (summary contempt exception to normal due process requirements applies only to conduct "actually observed by the court, and where immediate punishment is essential to prevent demoralization of the court's authority before the public") (citation and punctuation omitted). Here, the preparation and filing of bankruptcy petitions posed no such threat because the court did not adjudicate the alleged contempt until more than three months after it occurred and approximately two-and-a-half months after the court had notice of it as a result of Newton filing a plea of stay in which she represented that she had filed the bankruptcy petitions.

In these circumstances, even if the alleged contempt might be characterized as direct, there was no compelling interest in summary adjudication. Absent a strong interest in summary adjudication, we conclude that Newton was entitled to "more normal adversary procedures," including reasonable notice and a reasonable opportunity to prepare a defense. See *Ramirez*, 279 Ga. at 15 (2). We must, therefore, vacate the judgment below to the extent it is based on a finding of contemptuous conduct before the August 2 hearing, and we remand for further proceedings consistent with this opinion.

2. We consider next whether the trial court erred when it summarily adjudged Newton guilty of direct contempt based on something that she or her lawyer said or did during the August 2 "status conference." If Newton herself did anything contemptuous during these proceedings that obstructed the proceedings and impaired their integrity, we harbor no doubt that it was proper for the court below to adjudicate the direct contempt summarily. As indicated in Division 1, supra, where contemptuous conduct occurs in open court,

> a trial court has the power, after affording the contemnor an opportunity to speak in his or her own behalf, to announce punishment summarily and without further notice or hearing. This summary power is authorized where contumacious conduct threatens a court's immediate ability to conduct its proceedings, such as where a witness refuses to testify, or a party disrupts the court. Direct contempts in the presence of the court traditionally have been subject to summary adjudication, to maintain order in the courtroom and the integrity of the trial process in the face of an actual obstruction of justice.

*Ramirez*, 279 Ga. at 14 (2) (citations and punctuation omitted).

With these principles in mind, we have parsed the record of the August 2 hearing, in search of some conduct that might properly form the basis for a summary finding of direct contempt, but we can find none. Indeed, the transcript of the August 2 proceedings indicates that Newton herself said nothing at all at the hearing, except to speak her name when the court asked her to identify herself for the record. There is no indication that she spoke her name in a disrespectful manner or that she personally did anything else during the hearing that might have tended to show disrespect to the court, that adversely affected the integrity of the proceedings, or that impaired the ability of the court to conduct them. In short, we find no indication of anything that Newton herself said or did in the August 2 hearing that might even arguably support a finding of direct contempt.

Consequently, and in light of the court below's comments about the arguments made by Newton's lawyer, we think that the finding of direct contempt must be based on something that Newton's lawyer did or said at the August 2 hearing. And we think the court below most likely based its finding of direct contempt on the lawyer's argument that Newton was authorized after the April 13 hearing to file bankruptcy petitions concerning the properties that originally had been made part of the receivership because the court, even if it indicated an intent to dissolve or modify the receivership at the April 13 hearing, had not entered a written order to that effect.[10] Because the record contains no indication that the argument was made in an improper, disrespectful, or disruptive *manner*, we also conclude that the finding of direct contempt must be based on the *substance* of the argument. As a preliminary matter, we doubt seriously that the substance of legal arguments that a *lawyer* offers during a hearing on behalf of his client properly can form a basis for adjudging the *client* guilty of criminal contempt, at least in the absence of evidence, of which there is none here, that the client knew the arguments to be baseless, but directed the lawyer to make them anyway. Even assuming that the substance of the legal arguments of counsel could properly form the basis in some case for a finding of contempt on the part of the client, however, we do not think the substance of the argument made by Newton's lawyer can sustain the finding of direct contempt.

---

[10] The court below noted in its written order finding Newton in contempt that Newton, in open court on August 2, "continued to defy the Court's ruling that she had been removed as receiver" and "continued to defy the Court's ruling that, at a minimum, [certain] real property . . . had been removed from the receivership." To be sure, we have parsed the transcript of the August 2 hearing and discern nothing else that might properly have formed the basis for a finding that Newton committed direct contempt at the hearing.

Our consideration of this issue is informed by *In re Jefferson*, 283 Ga. 216, 220 (657 SE2d 830) (2008), in which our Supreme Court held that an attorney may be held in contempt for statements made during courtroom proceedings only if the court finds beyond a reasonable doubt

> (1) that the attorney's statements and attendant conduct either actually interfered with or posed an imminent threat of interfering with the administration of justice and (2) that the attorney knew or should have known that the statements and attendant conduct exceeded the outermost bounds of permissible advocacy.[11]

Applying this principle to the circumstances of this case, although the court below might have seen no merit in the argument that Newton's filing of the bankruptcy petitions on April 30 was proper, nothing in the record suggests that this argument interfered with, or was likely to interfere with, the integrity of the proceedings or the capacity of the court to administer justice. Nor does the record indicate that Newton or her lawyer had a reason to think that the argument—even if it lacked merit, something about which we need not, and do not, decide—exceeded the outermost bounds of permissible advocacy. As discussed in note 3, supra, there was disagreement amongst those present at the April 13 hearing about what action the court had taken, or had announced its intention of taking, at that hearing. Moreover, the court below specifically invited the argument by asking Newton's lawyer, who described himself as her "bankruptcy counsel" whether he thought Newton was authorized to file the bankruptcy petitions. As a result, the substance of the legal arguments made by her lawyer at the August 2 hearing cannot sustain the finding of direct contempt. There being nothing else in the record to sustain the finding, we reverse the judgment below to the extent it is based on a finding of contemptuous conduct by Newton or her lawyer at the August 2 hearing.

3. Newton requests that, if she is retried for contempt based on her actions prior to the August 2 "status conference," her case be

---

[11] The Supreme Court also identified some specific factors that a trial court properly may consider in assessing statements made in court by a lawyer and whether they amount to contempt: (1) the extent to which the lawyer was put on notice, prior to a contempt citation, that continuing to make the offending statements would constitute contempt; (2) the likely impact of the offending statements on the deliberations of the finder of fact; (3) whether the making of the offending statements were an isolated incident or reflected a broader pattern of behavior; (4) the significance of the particular subject of the statements in the context of the case as a whole, as well as the relative gravity of the case; and (5) the extent, if any, to which the trial court provoked the offending statements with its own conduct. Id.

assigned to another judge.[12] We note that the issue of contempt involves a dispute about what happened at the April 13 hearing, something about which the record is silent because the hearing was not recorded, and about which the persons present, including the judge, now have divergent recollections. Consequently, we think it would be better for another judge to conduct any contempt proceedings on remand. See *Dowdy*, 251 Ga. at 143 (3); see also *In re Crane*, 253 Ga. 667, 668 (1) (324 SE2d 443) (1985) (impartiality of judge "might reasonably be questioned by reason of his knowledge that he was likely to be a material witness in the proceeding"). We order, therefore, that this case be reassigned for the purpose of any further contempt proceedings against Newton.

*Judgment reversed in part and vacated in part, and case remanded with direction. Smith, P. J., and Mikell, J., concur.*

DECIDED JUNE 3, 2011.

*Day & Crowley, Bobby L. Scott, Christopher J. McFadden*, for appellant.

*Page, Scrantom, Sprouse, Tucker & Ford, William L. Tucker, Kirsten C. Stevenson, Gardner, Willis, Sweat & Handelman, Mark L. Pickett, Langley & Lee, Lauren M. Brock, John T. Martin, Frank K. Martin, Justin R. Arnold, Jay P. Wells*, for appellees.

---

[12] Given our holdings in Divisions 1 and 2, it is not necessary for us to reach the other claims of error that Newton asserts on appeal.