**THIRD DIVISION
MILLER, P. J.,
MCFADDEN and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**November 15, 2016**

# In the Court of Appeals of Georgia

A16A1285. CHRYSLER GROUP, LLC v. WALDEN et al.

MCFADDEN, Judge.

This case involves a tragic vehicle collision that resulted in the death of four-year-old Remington Walden. The collision occurred when the child was a passenger in the backseat of a 1999 Chrysler Jeep Grand Cherokee. Bryan Harrell, a co-defendant who has not appealed, was driving a pickup truck and struck the back of the Grand Cherokee. The gas tank of the Grand Cherokee was punctured in the wreck and the vehicle caught fire. Remington Walden died in the fire.

In 2012, Remington Walden's parents filed this action against Chrysler Group, LLC n/k/a "FCA US LLC" and Harrell. They alleged that Chrysler acted with a reckless or wanton disregard for human life in the design or sale of the Grand Cherokee, and that Chrysler breached a duty to warn of the hazard associated with the

use of the vehicle. After a nine-day trial, the jury returned a verdict in favor of the plaintiffs, awarding $120 million in damages for wrongful death and $30 million in damages for pain and suffering. The jury found Harrell to be one percent at fault and Chrysler to be ninety-nine percent at fault. Chrysler filed a motion for new trial, which the trial court denied, conditioned on the plaintiffs' acceptance of a remittitur of the wrongful death verdict to $30 million and of the pain and suffering verdict to $10 million. The plaintiffs accepted the remittitur, and the trial court entered judgment accordingly.

Chrysler now appeals. It argues that the trial court erred by denying its directed verdict motions, but we find that the trial court properly submitted the plaintiffs' claims to the jury for resolution. Chrysler argues that the trial court erred by allowing the plaintiffs to introduce evidence of 17 other rear-end collisions involving Jeep vehicles because the plaintiffs failed to show that the collisions were substantially similar to the collision at issue, but Chrysler has not shown that the trial court abused his discretion in admitting that evidence. Chrysler argues that the trial court erred by admitting evidence of incidents involving the Ford Pinto without determining that the incidents were substantially similar to the incident here, but the references to Pintos were general references, not evidence of particular incidents.

2

Chrysler argues that the trial court erred in admitting certain evidence and allowing certain argument. Specifically, Chrysler asserts that the trial court erred by allowing the plaintiffs to question a witness about the compensation paid to its chief executive officer, also a witness, but evidence of a witness's relationship to a party is always admissible. Chrysler argues that the trial court erred by allowing plaintiffs' counsel to argue in closing that Chrysler should be imprisoned, but Chrysler has not shown an abuse of discretion.

Chrysler argues that the trial court erred by allowing the plaintiffs to question witnesses about a recall request letter issued by a division of the National Highway Traffic Safety Administration ("NHTSA") during an investigation of the fuel tanks in Jeep SUVs. It argues that the recall request letter was inadmissible hearsay because it included only tentative findings, but the trial court did not abuse his discretion in admitting the recall request letter.

Conversely, Chrysler argues that the trial court erred by excluding the testimony of two of its experts, but Chrysler challenges only one of the several grounds upon which the trial court excluded the testimony and we will affirm a trial court's ruling that is right for any reason.

Finally, Chrysler raises challenges based on the size of the verdict and the judgment entered on the remitted verdict. It argues that the size of the jury's verdict demonstrates that the verdict was motivated by passion and prejudice and a desire to punish and deter, although the plaintiffs did not seek punitive damages, but we find that Chrysler has failed to show the verdict resulted from prejudice. Chrysler also argues that the trial court failed to sufficiently remit the damages awards, but we find that the trial court did not err. We therefore affirm.

1. *Denial of directed verdict motions*.

Chrysler argues that the trial court erred by denying its directed verdict motions on the plaintiffs' claims that Chrysler acted with a reckless or wanton disregard for human life in the design or sale of the Grand Cherokee, and that Chrysler breached a duty to warn of the hazard associated with the use of the vehicle. We disagree.

The plaintiffs filed their action beyond the applicable ten-year statute of repose set forth in OCGA § 51-1-11 (b) (2), which therefore controls the claims available to them. The statute of repose excepts certain claims of wanton and reckless conduct from its application and does not apply to failure to warn claims. OCGA § 51-1-11 (c). As noted, the plaintiffs asserted a claim of reckless or wanton conduct and a claim of failure to warn. Both claims were founded on the assertion that Chrysler knew that

the location of the fuel tank in the 1999 Grand Cherokee was dangerous, yet it consciously and deliberately continued to manufacture and sell the vehicle with the gas tank in that location and it failed to warn the public of the danger. Chrysler moved for directed verdict at the close of the plaintiffs' case and at the close of the evidence. The court denied the motions, and Chrysler enumerates as error the denial of the motions.

> A motion for directed verdict should not be granted where there exists even slight material issues of fact, because the trial court is substituting its judgment for the jury's; only when there is an absence of evidence or when no evidence supports an essential element of the case should a directed verdict be granted, because the trial judge takes the determination of the facts from the jury.

*Teklewold v. Taylor*, 271 Ga. App. 664, 665 (610 SE2d 617) (2005) (citation omitted). "The appellate review standard of a trial court's denial of a directed verdict motion is the any evidence standard. In considering a ruling on a motion for directed verdict, the evidence must be construed most favorably to the party opposing the motion." *Key Safety Systems v. Bruner*, 334 Ga. App. 717, 717-718 (780 SE2d 389) (2015) (citation omitted). See also OCGA § 9-11-50 (a).

Viewed in this light, the record shows that on the afternoon of March 6, 2012, Emily Newsome was driving her four-year-old nephew, Remington Walden, to a tennis lesson in her father's 1999 Jeep Grand Cherokee, which was manufactured February 2, 1999. The child was seated in the back of the vehicle. As Newsome was waiting to make a left-hand turn, defendant Bryan Harrell, who was driving a Dodge Dakota pickup truck, collided with the back of the Grand Cherokee. The fuel tank of the Grand Cherokee, which was located behind the rear axle, was ruptured in the collision. Gasoline poured from the tank and ignited. The Grand Cherokee was engulfed in flames. Newsome was able to climb out of the driver's side window of the Grand Cherokee, but Remington Walden could not escape and Newsome could not get him out. The child was alive and conscious while the Grand Cherokee was on fire and may have lived up to a minute with flames in contact with his body. He died from injuries caused by the fire. The plaintiffs presented evidence that there is no more painful way to die.

The plaintiffs presented the testimony of Judson Estes, the Chrysler employee who managed the crash test program for Grand Cherokees starting with the 1996-1997 model year. Estes testified that in 1998, Chrysler knew that the gas tank in the 1999 Grand Cherokee was vulnerable and would be crushed in rear impacts.

Michael Teets, a senior engineer and specialist in fuel systems for Chrysler, testified that, as a rule, there should be no "crush" in the tank area. He acknowledged that design guidelines for fuel supply, written before he was hired at Chrysler in 1981, provided that the fuel tank "should be located in a manner that avoids known impact areas," where the potential of the tank being crushed in a collision is far greater. At some point, Chrysler convened a group of employees, called the "Rear Impact Tech Club," to review old fuel system guidelines and methodologies. Teets was a member of the group and, in December 2001, informed the group that there "should be no crush in tank area"

The plaintiffs presented other evidence that Chrysler knew the benefits of locating the gas tank "midship," or between the front and rear axles. They introduced marketing brochures for other Chrysler vehicles, which, the plaintiffs' expert testified, demonstrated an extensive history of Chrysler's knowledge of protection from rear impact that comes from placing gas tanks midship. These included a brochure for a 1996 Dodge Caravan, a 1998 Dodge Durango SUV, and a 1999 Ram Cargo Van.

The plaintiffs also presented evidence of 17 other collisions involving Jeep vehicles with fuel tanks located behind the rear axle, in which the Jeep vehicle was

rear ended and fuel escaped from the tank. They showed that Chrysler had notice of these other incidents before the collision at issue and had notice of one of them prior to the sale of the Grand Cherokee involved in this case. (Although Chrysler challenges the admission of this evidence, it has failed to show that the trial court abused his discretion in admitting it, as detailed below in Division 2.)

The plaintiffs presented evidence that had Chrysler located the gas tank between the front and rear axles, something Chrysler stipulated that it could have done, then the tank would not have ruptured because the only impact was behind the rear axle. Chrysler also stipulated that had gas not leaked from the tank, there would have been no fire.

(a) *Denial of directed verdict on claim that Chrysler acted with a reckless or wanton disregard for human life in the design or sale of the vehicle.*

Chrysler argues that this evidence is insufficient to sustain plaintiffs' claim that Chrysler acted with a reckless or wanton disregard for human life in the design or sale of the Grand Cherokee. We have defined a reckless act as an act that is "intended by the actor, [although] the actor does not intend to cause the harm which results from it. It is enough that he realize or, from facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects

that his conduct may prove harmless." *Arrington v. Trammell*, 83 Ga. App. 107, 112 (62 SE2d 451) (1950) (citation omitted). We have defined wanton conduct as conduct that "is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent." *Chrysler Corp. v. Batten*, 264 Ga. 723, 726 (3) (450 SE2d 208) (1994) (citations and punctuation omitted).

First, Chrysler argues that it was entitled to a directed verdict on the claim that it acted with a reckless or wanton disregard for human life because the Grand Cherokee's fuel tank design fully complied with Federal Motor Vehicle Safety Standards. Such compliance "is a factor for the jury to consider in deciding the question of reasonableness," but it does not render Chrysler immune from liability. *Doyle v. Volkswagenwerk Aktiengesellschaft*, 267 Ga. 574, 577 (481 SE2d 518) (1997). "[A] manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations does not eliminate conclusively its liability for its design of allegedly defective products." *Banks v. ICI Americas*, 264 Ga. 732, 736 n. 6 (450 SE2d 671) (1994) (citations omitted). Therefore, simply because Chrysler complied with the federal standard did not entitle it to a directed verdict.

Next, Chrysler argues that it was entitled to a directed verdict on the claim that it acted with a reckless or wanton disregard for human life because there were 27

9

million vehicles being driven on the road with rear-mounted fuel tanks at the time of the NHTSA's investigation into Jeep vehicles. This fact, however, was evidence for the jury to consider; it does not mean that the plaintiffs submitted no evidence to support their claim. See id. (compliance with industry-wide practices does not conclusively eliminate manufacturer's liability).

Chrysler also argues that it was entitled to a directed verdict on the claim that it acted with a reckless or wanton disregard for human life because only one of the plaintiffs' similar incidents occurred before the sale of the Grand Cherokee. The plaintiffs, however, introduced other evidence that before this Grand Cherokee was manufactured and sold, Chrysler knew that locating fuel tanks midship provided safety benefits, that it was possible to locate the fuel tank in the 1999 Grand Cherokee midship, and, most significantly, that Chrysler knew that gas tanks in 1999 Grand Cherokees were vulnerable and would be crushed in rear impacts.

From this evidence, a jury might legitimately conclude that "from facts which [Chrysler knew], [it] should [have] realize[d] that there [was] a strong probability that harm may result, even though [it] hope[d] or even expect[ed] that [its] conduct may prove harmless." *Arrington*, 83 Ga. App. at 112 (citation omitted). Given our any evidence standard of review and our duty to construe the evidence most favorably to

the plaintiffs, we cannot say that the trial court erred in denying Chrysler's motion for directed verdict on this claim. See *Waldo v. Moore*, 241 Ga. App. 797, 799 (527 SE2d 887) (2000) (plurality opinion) (defendant was not entitled to a directed verdict because evidence authorized jury to find defendant's conduct was wilful and wanton).

(b) *Denial of directed verdict on claim that Chrysler breached the duty to warn.*

Chrysler argues that the trial court erred by denying its motion for directed verdict on the plaintiffs' failure to warn claim because the plaintiffs did not introduce evidence that they would have seen a warning had one been provided, or that the owner of the vehicle (Remington Walden's grandfather) or the driver (Remington Walden's aunt) would have read or communicated any warning to the plaintiffs. Thus, Chrysler argues, the plaintiffs have failed to establish proximate causation.

A failure to read a warning will defeat a "claim grounded upon an inadequacy of warning by reason of the insufficient, inaccurate misleading nature of the *content* of the warning." *Wilson Foods Corp. v. Turner*, 218 Ga. App. 74, 76 (1) (460 SE2d 532) (1995) (citation omitted; emphasis in original). This is because even if the warning had been adequate, the plaintiff still would have been injured because in not reading the warning, he would not have benefitted from its adequacy; his failure to

11

read would have not been the cause of his injury. See *Camden Oil Co. v. Jackson*, 270 Ga. App. 837, 840 (1) (a) (609 SE2d 356) (2004). But here, there was no warning, so there was nothing for the plaintiffs or the owner or driver of the Grand Cherokee to read. Whether a plaintiff has shown

> proximate cause resulting from a complete lack of warning . . . [is] peculiarly [a] question[] for the jury. . . . The defendant cites to no prior precedent requiring a plaintiff alleging a failure to warn claim [involving a complete lack of warning] to provide evidence [that he would have seen it] had an adequate warning been included, and we decline to adopt such a requirement at this time.

*Key Safety Systems*, 334 Ga. App. at 720 (1) (citation and punctuation omitted) (rejecting argument that plaintiff failed to prove proximate causation because he did not testify that he would have purchased a different car had an adequate warning been provided). See also *Bullock v. Volkswagen Group of America*, 107 FSupp3d 1305, 1316 (II) (C) (2) (M.D. Ga. 2015) (distinguishing failure-to-warn, no-warning claims from failure-to-warn, inadequate warning claims and failure-to-adequately-communicate-warning claims).

2. *Admission of evidence of other similar incidents.*

To prove that Chrysler knew of the danger of the fuel tank's location, the plaintiffs introduced evidence of 17 other incidents. Chrysler claims the admission of this evidence was error. We disagree.

The plaintiffs' claims were founded on the assertion that Chrysler knew that the location of the fuel tank in the 1999 Grand Cherokee was dangerous, yet it consciously and deliberately continued to manufacture the vehicle with the gas tank in that location and it failed to warn the public of the danger. To prove that knowledge, the plaintiffs introduced, among other things, evidence of 17 rear-end collisions involving Jeep vehicles with gasoline tanks located at the rear of the vehicle and gasoline leakage. Chrysler argues that the trial court erred in admitting evidence of these 17 collisions because they were not substantially similar to the collision at issue.

"In product liability actions, evidence of other incidents involving the product is admissible[] and relevant to the issue[] of notice of a defect . . . provided there is a showing of substantial similarity." *Ray v. Ford Motor Co.*, 237 Ga. App. 316, 317 (1) (514 SE2d 227) (1999) (citations omitted). To show substantial similarity, the plaintiff must come forward with evidence that the other "incidents share a common design, common defect, and common causation with the alleged design defect at

issue." *Colp v. Ford Motor Co.*, 279 Ga. App. 280, 284 (2) (630 SE2d 886) (2006). "Absent clear abuse, the trial court's exercise of discretion in admitting or refusing to admit such evidence is entitled to deference[.]" *Cooper Tire & Rubber Co. v. Crosby*, 273 Ga. 454, 457 (2) (543 SE2d 21) (2001).

Chrysler argues that the trial court erred in finding common design and common causation. As for common design, Chrysler argues that the trial court erred because 13 of the other incidents involved different Jeep models with different fuel-system and structural designs than the 1999 Jeep Grand Cherokee. (Chrysler does not challenge the finding of common design for the remaining four incidents.) )

The plaintiffs presented evidence that each of those 13 incidents involved a Jeep SUV with the gas tank located approximately eleven inches from the rear of the vehicle and hanging down about six inches. The plaintiffs cited as evidence of these measurements the "Subject Vehicle Measurements Data" that Chrysler submitted to the NHTSA during its investigation of the gas tanks. They also pointed out that NHTSA investigated all of these rear-tank Jeep models in a single defect investigation and defined the defect as "the placement of the fuel tanks in the position behind the axle and how they were positioned, including their height above the roadway." Further, the plaintiffs cited the deposition testimony of Chrysler chief

14

executive Sergio Marchionne, who admitted that tank-related fires with one of the Jeep models would prompt Chrysler to investigate the others. Finally, they relied on the testimony of their expert witness in fuel system design.

Simply because the other incidents involved different Jeep models does not make them inadmissible. See *Ford Motor Co. v. Reese*, 300 Ga. App. 82, 90 (3) (684 SE2d 279) (2009) (affirming admission of evidence of other similar incidents involving unspecified Ford vehicles with seatbacks of "the same design as the [Ford] Tempo seatback at issue here"). The question is whether there is a common design, *Colp*, 279 Ga. App. at 284 (2), regardless of the products' names. In light of the plaintiffs' evidence, we cannot say that the trial court abused his discretion in ruling that the vehicles involved in the other incidents and the vehicle involved in this incident had a common design.

As for common causation, the plaintiffs presented the testimony of their expert that all the other incidents and the incident at issue involved common causation: a rear impact to the involved Jeep caused gasoline leakage. We have affirmed a trial court's decision to admit evidence of other similar incidents in which the causation was "a rear impact collision [] and a seatback that deformed in the accident." *Reese*,

300 Ga. App. at 90 (3). Chrysler has not shown that the trial court abused his discretion in finding common causation.

3. *References to Pinto.*

Chrysler argues that the trial court erred by admitting evidence "concerning fuel-fed fires, deaths, and injuries involving the 1970s-era Ford Pinto" without first conducting the substantial similarity analysis described in Division 2. Chrysler has not shown that the trial court erred, however, because it has not pointed to anywhere in the transcript where the trial court admitted other-incident evidence involving the Pinto. The references to the Ford Pinto were general references, not evidence of specific, discrete accidents involving the Ford Pinto. Compare *Volkswagen of America v. Gentry*, 254 Ga. App. 888, 895-896 (8) (564 SE2d 733) (2002). Two of Chrysler's record citations regarding this issue are to plaintiffs' opening statement and two are to plaintiffs' closing argument. And the trial court properly instructed the jury that counsels' statements are not evidence. One citation is to plaintiffs' counsel asking Marchionne if he could disagree with a statement in a letter from the NHTSA (the recall request letter discussed in Division 7 below) that "after Pinto, manufacturers began to adopt designs in which fuel tanks were located in less vulnerable locations than behind the rear axle." Chrysler's final record citation on this

16

issue is to plaintiffs' counsel's questions to a Chrysler senior engineer and fuel system specialist about whether automobile manufacturers have known since the Pinto that rear gas tanks were a bad idea. Chrysler mischaracterizes the references to Pintos as "other incidents" evidence and has failed to demonstrate error.

4. *The exclusion of Chrysler's expert evidence.*

Chrysler argues that the trial court erred in excluding the testimony and statistical analyses of two experts which were relevant to show the overall safety of the challenged design to the overall safety of available alternative designs. It argues that the trial court erred by excluding the evidence for lack of substantial similarity, because the substantial similarity rule does not apply to this kind of evidence. But that was only one of the reasons the trial court excluded the evidence. He also found that the evidence was irrelevant, because it concerned the overall safety of various vehicles, but the plaintiffs' claims related only to the safety of the fuel system design in rear impacts. He further found that the prejudice and confusion from the proposed testimony outweighed its probative value; and that neither expert satisfied the requirements of OCGA § 24-7-702 (b) for the admission of expert testimony. Chrysler does not challenge these other reasons for excluding the evidence. We therefore cannot say that the trial court erred. See *DaimlerChrysler Motors Co. v.*

17

*Clemente*, 294 Ga. App. 38, 57 (12) (668 SE2d 737) (2008) (pretermitting whether trial court erred in excluding expert testimony on one ground, but affirming its exclusion on an alternate ground raised below); *Sumter County v. Pritchett*, 125 Ga. App. 222, 227 (3) (186 SE2d 798) (1971) (trial court's decision to exclude evidence will be affirmed if it is right for any reason).

5. *CEO's compensation.*

Chrysler argues that the trial court erred by admitting evidence of its CEO Marchionne's compensation from Chrysler and then allowing the plaintiffs to argue to the jurors that they should use this information as the basis for calculating the amount of a wrongful death award. The evidence was admissible to show bias, and the trial court did not abuse his discretion in admitting it.

During cross-examination, plaintiffs' counsel questioned Mark Chernoby, Chrysler's chief operating officer of product development, head of global quality, and head of portfolio planning, about Marchionne's compensation package. Chernoby testified that in 2014, Marchionne received a $30 million "cash award," received more than $6.4 million in salary and incentive pay, which usually is based on company performance, exercised stock options worth $16.92 million, and received other benefits, including personal use of an aircraft, the use of a company car and

18

driver, personal and home security, and medical insurance. Chrysler argues that the evidence of the financial circumstances of a party are always inadmissible, that Marchionne's income was irrelevant to any issue, and that the evidence was prejudicial.

First, as Chrysler conceded at trial, Marchionne was not a party, so the rule that the financial circumstances of a party are generally inadmissable does not apply. See generally *Bailey v. Edmundson*, 280 Ga. 528, 534 (6) (630 SE2d 396) (2006) ("The general rule is that evidence of the wealth or worldly circumstances of a party litigant is never admissible, except in those cases where position or wealth is necessarily involved.") (citation and punctuation omitted).

Second, a jury could find that Marchionne's compensation package made the existence of bias in favor of Chrysler more probable. Thus evidence of the compensation package was relevant to support that inference. Under OCGA § 24-6-622, "[t]he state of a witness's feelings towards the parties and the witness's relationship to the parties may *always* be proved for the consideration of the jury." (Emphasis supplied.)

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the

witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.

*United States v. Abel*, 469 U. S. 45, 52 (105 SCt 465, 83 LE2d 450) (1984). "The intent or motive of a witness is a legitimate subject of inquiry, and the fact that a witness, in his connection with any pending litigation, is influenced by financial considerations may affect his credit and diminish the weight of his testimony." *Lloyd v. State*, 40 Ga. App. 230, 231 (149 SE 174) (1929) (citations and punctuation omitted). "The jury could consider whether [Marchionne] had an interest in providing testimony favorable to his employer that insulated it from liability . . . ." *McNeely v. Wal-Mart Stores*, 246 Ga. App. 852, 854 (b) (542 SE2d 575) (2000) (citation omitted). See also *BankAtlantic v. Blythe Eastman Paine Webber*, 955 F2d 1467, 1474-1475 (B) (3) (11th Cir. 1992) (witness who was the chairman of appellant bank had a financial interest in the bank, and thus a stake in the outcome of the litigation, so court did not abuse discretion in admitting evidence of witness's high salary over objection that it was irrelevant and highly prejudicial).

Finally, any "concerns regarding prejudice in this instance must yield to the statutory mandate of OCGA § [24-6-622]: 'The state of a witness's feelings towards the parties and his relationship to them *may always be proved* for the consideration of the jury.'" *Orkin Exterminating Co. v. McIntosh*, 215 Ga. App. 587, 593 (5) (452 SE2d 159) (1994) (emphasis in original). We cannot say that the trial court abused his discretion in admitting evidence of Marchionne's compensation.

Chrysler argues that it was improper for plaintiffs' counsel to reference Marchionne's compensation in closing argument because his compensation had no relevance to any compensatory purpose. It refers to two instances in the plaintiffs' closing argument.

In the first instance, using mortality tables, plaintiffs' counsel calculated that Remington Walden would have had about 20,000 days to live, had he not died in this collision. Counsel then observed that defense counsel had asked the jury to return a verdict for wrongful death damages in the amount of $1.3 million. Counsel calculated that such an award would value Remington Walden's life at $57 per day but "what [defense counsel] said Remi's life was worth, Marchionne made 43 times as much in one year."

21

In the second instance, in his concluding remarks, plaintiffs' counsel showed the jury the verdict form, asked the jury to return a favorable verdict on liability, and then stated:

> We're going to ask you to return a verdict for pain and suffering in whatever amount you think is appropriate. We're going to ask for you to return a verdict for the full value of Remington Walden's life – this is the hard part of what I do. Frankly, it's totally up to you all. But I hope you'll return a verdict that's meaningful. We ask that you return a verdict for the full value of Remington's life of at least $120 million. The amount is totally up to you. . . . That's less than two years of what Mr. Marchionne made just last year. He made $68 million last year.

"While counsel should not be permitted in argument to state facts which are not in evidence, it is permissible to draw inferences from the evidence, and the fact that the deductions may be illogical, unreasonable, or even absurd is a matter which may be addressed by opposing counsel in his or her closing argument." *Lee v. Ga. Power Co.*, 296 Ga. App. 719, 726 (9) (675 SE2d 465) (2009) (citation and punctuation omitted). "Counsel is permitted wide latitude in closing argument and any limitation of argument is a matter for the trial court's discretion." *Lillard v. Owens*, 281 Ga. 619, 622 (2) (641 SE2d 511) (2007) (citations and punctuation omitted). In light of the

permissible admission of evidence of Marchionne's compensation, we cannot say that the trial court abused his discretion in allowing this argument.

6. *Reference to imprisonment.*

Chrysler argues that the trial court erred by allowing plaintiffs' counsel to tell the jury in closing argument that "Chrysler ought to be in Reidsville instead of Bryan Harrell." Chrysler has not shown that the trial court abused his discretion.

In closing argument, Chrysler's counsel argued that Harrell admitted negligence, pled guilty, and was responsible for the collision; and as Harrell was responsible, the jury should return a verdict in favor of Chrysler. Plaintiffs' counsel responded that "Harrell from day one accepted responsibility," reviewed Harrell's testimony in which he apologized, and pointed out that "[h]e's serving time in Reidsville for his responsibility." On the other hand, counsel argued, "Chrysler has denied everything and still denies everything and has put up what is, in all candor, a dishonesty defense. Chrysler ought to be in Reidsville instead of Bryan Harrell."

Counsel has

> ample latitude to argue what has transpired in a case from its inception to its conclusion, and the conduct of the party or his counsel with respect to the case is the subject of legitimate comment, and the range of such comment is necessarily in the discretion of the trial judge; and unless it

23

can be shown that such discretion has been abused and some positive injury done by the remarks of counsel, the discretion of the trial judge will not be controlled.

*Findlay v. Griffin*, 225 Ga. App. 475, 477 (5) (484 SE2d 80) (1997) (citation and punctuation omitted). Chrysler has not shown that the trial court abused his discretion in this instance.

7. *Admission of recall request letter.*

Chrysler argues that the trial court erred by allowing the plaintiffs to introduce evidence of the NHTSA's Office of Defect Investigation's ("ODI") recall request letter, which included a preliminary assessment of the Grand Cherokee's fuel tank design. It also challenges the admission of evidence of a 2013 meeting between Marchionne, David Strickland, the head of NHTSA, and Ray LaHood, the Secretary of the U. S. Department of Transportation, after which the ODI issued its final conclusion that the agency found that the 1999 Grand Cherokee's fuel tank design was not defective.

Chrysler moved in limine to exclude "evidence of or reference to a NHTSA investigation of Jeep vehicles" but to include "the ODI's finding concerning the Grand Cherokee WJ." Citing *Toole v. McClintock*, 999 F2d 1430 (11th Cir. 1993),

24

Chrysler argued before the trial court, and now argues on appeal, that ODI's recall request letter, the letter that included a finding of a design defect, is inadmissible hearsay.

The trial court addressed the motion in limine in a thorough order, observing that it was undisputed that

> commencing in 2010, before the subject wreck, NHTSA investigated Chrysler's Jeeps with rear gas tanks, including the subject vehicle; that NHTSA's Office of Defects Investigation made certain findings indicating a safety related defect existed with respect to the rear location of gas tanks on those Jeeps, and so informed Chrysler on June 3, 2013; that after meetings between Chrysler CEO Sergio Marchionne, NHTSA Administrator David Strickland, and Secretary of Transportation Ray LaHood, an agreement was reached that there would be no finding of "defect" but there would be a recall of certain Jeeps with rear gas tanks which involved the placement by Chrysler of trailer hitches on some of those Jeeps and inspection of trailer hitches already installed on other of those Jeeps; but there was no recall of the 1999-2004 Grand Cherokees.

The court explained that

> Chrysler seeks to introduce the document by which NHTSA closed the investigation (labeled "ODI Resume" and dated 11/11/14), but simultaneously exclude the fact that an investigation ever occurred *and* the process that led to that closure of the investigation. It would be both inconsistent and misleading to admit evidence regarding the closure of

the NHTSA investigation, but simultaneously exclude evidence that the investigation ever occurred. If Chrysler seeks to make arguments based on the closure of the investigation, then as a matter of fairness, Plaintiffs are entitled to introduce evidence about how that closure occurred, what that closure means, and what events led to the closure of the investigation.

(Emphasis in original.) The court concluded that the statute providing an exception to the hearsay rule for public records and reports is controlling:

the ODI June 3, 2013 letter, or at least parts of it, are admissible under OCGA § 24-8-803 (8) (A), (B)[,] and (C) [and that] allowing Chrysler to argue that the statements in the ODI Resume document mean Chrysler got a "clean bill of health" for the 1999-2004 Grand Cherokees would, given the contents of ODI's June 3, 2013 letter and the alleged circumstances leading to the closing of the investigation, be manifestly unfair, misleading, and prejudicial to Plaintiffs.

(The text of OCGA § 24-8-803 (8) is reproduced in full in the margin.[1]) Chrysler has not shown that, under the only authority it cites, the trial court abused his discretion in admitting evidence of the June 3, 2013, ODI recall request letter.

_____

[1]OCGA § 24-8-803 (8) provides:

The following shall not be excluded by the hearsay rule, even though the declarant is available as a witness:

. . .

(8) *Public records and reports*. Except as otherwise provided by law, public records, reports, statements, or data compilations, in any form, of public offices, setting forth:

(A) The activities of the public office;

(B) Matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, against the accused in criminal proceedings, matters observed by police officers and other law enforcement personnel in connection with an investigation; or

(C) In civil proceedings and against the state in criminal proceedings, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness[.]

In that document, ODI stated its "tentative view [that] there is a performance defect and design defect," in certain Chrysler vehicles, including the 1999 Grand Cherokee, and that "[t]he performance defect is that the fuel tanks installed on these vehicles are subject to failure when the vehicles are struck from the rear," potentially resulting in fuel leakage and fire, and that "[t]he design defect is the placement of the fuel tanks in the position behind the axle and how they were positioned, including their height above the roadway."

Citing *Toole*, 999 F2d at 1435 (2) (B), Chrysler argues that the ODI letter was inadmissible hearsay. In *Toole*, a product liability, medical malpractice action for damages from ruptured breast implants, the 11th Circuit held that it was an abuse of discretion to admit a document prepared by the Food and Drug Administration. Id. at 1433 (2) (B). The document contained the agency's proposal to require pre-market approval for silicone-gel filled breast prostheses and stated the agency's "proposed findings" on risks posed by such prostheses. Id.

The court in *Toole* held that the report was irrelevant because it did not address the specific type of implants at issue in the case and it contained findings that the FDA proposed years after the relevant dates. Id. at 1434 (2) (B). The court also ruled that the report did not qualify for admission under Federal Rule of Evidence 803 (8)

28

(C) because it was "not the kind of trustworthy report described in Rule 803." Id. The court noted that the report contained only proposed findings and those findings were inferred from articles in medical journals. Id. at 1434-1435 (2) (B). The 11th Circuit concluded that the trial court should have excluded the report because it was inadmissible hearsay, given the "tentative and second-hand nature" of its findings. Id. at 1435 (2) (B). Here, on the other hand the recall request letter was, at least in part, not introduced for hearsay purposes. And, to the extent the letter was hearsay, Chrysler has not shown an abuse of discretion.

"For a statement to constitute hearsay, it must be 'offered in evidence to prove the truth of the matter asserted.' OCGA § 24-8-801 (c)." *Gates v. State*, 298 Ga. 324, 326 (2) (781 SE2d 772) (2016). One purpose for which the ODI recall request letter was offered, however, was to cast doubt on the credibility of the ODI resume. The ODI recall request letter was part of a timeline, which first showed the ODI reaching an initial finding that the vehicle had a design defect, then Chrysler's CEO meeting with the head of the NHTSA and the Secretary of the U. S. Department of Transportation, and finally "the agency" (the ODI resume does not specify whether "the agency" is ODI or NHTSA) reaching a contrary conclusion that the model year 1999-2004 Grand Cherokee "did not present an unreasonable risk to safety." The ODI

29

recall request letter was offered, at least in part, not for the substance of the finding of defect, but to support an inference that the meeting led ODI to change the opinion regarding defect to that expressed in the ODI resume. "[W]hen disputed evidence is admissible for any reason, a trial court does not abuse [his] discretion in denying a motion in limine and admitting it." *Presswood v. Welsh*, 271 Ga. App. 459, 461 (3) (610 SE2d 113) (2005) (citation omitted).

Moreover, Chrysler has not shown that under *Toole*, the only case it cites, that the trial court abused his discretion in admitting the evidence under Rule 803. As noted, in *Toole*, the Eleventh Circuit determined that the evidence at issue was improperly admitted under Rule 803 because it was not trustworthy. Here, ODI itself conducted a years-long investigation, unlike the FDA in *Toole*, which inferred its findings from articles in medical journals. ODI requested and received substantial data from Chrysler. It "obtained incident information from the fatality analysis reporting system (FARS) and NHTSA complaint databases." Where available, it obtained police reports. Further, unlike the finding challenged in *Toole*, some of the findings in the recall request were *not* labeled as tentative, including the findings that "Chrysler was certainly aware of the safety benefits of placing the tank in front of the rear axle;" that "the [model year] 1993-2004 Grand Cherokee performed poorly when

compared to all but one of the [model year] 1993-2007 peer vehicles, particularly in terms of fatalities, fires without fatalities, and fuel leaks in rear end impacts and crashes;" and that "[a] 1993 study of fire related deaths in rear crashes occurring from 1977 to 1989 concluded that the increasing relocation of tanks ahead of the rear axle had a substantial effect on the reduction of these deaths in rear impacts."

Chrysler has not shown that the trial court abused his discretion in admitting this evidence.

8. *Verdict.*

Chrysler argues that it is entitled to a new trial because the amount of damages the jury awarded in its verdict is evidence that an improper motive caused the jury to find Chrysler liable. It argues that the damages awards bear no rational relationship to any conceivable compensatory purpose and, when viewed in light of the other claims of error, was plainly motivated by passion and prejudice, and a desire to punish and deter.

The amount of damages a jury awards will require the setting aside of the verdict only rarely: "Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear

exorbitant, flagrantly outrageous, and extravagant." *Realty Bond & Mtg. Co. v. Harley*, 19 Ga. App. 186, 187-188 (91 SE 254) (1917) (punctuation omitted).

The plaintiffs presented evidence that their four-year-old son burned to death in the Grand Cherokee. They introduced evidence that he could have grown up to be anything in life: a firefighter, an engineer, a lawyer, or a CEO with unlimited earning potential. The plaintiffs presented evidence that the child could not escape and his aunt could not get him out; that he was alive and conscious while the Grand Cherokee was on fire; and that he may have lived up to a minute with flames in contact with his body. They presented evidence that there is no more painful way to die.

Contrary to the cases Chrysler cites in its brief, a review of the evidence bearing on damages does not lead us to believe that we must infer that an improper motive invaded the trial. "[C]ourts will never, in the absence of the most satisfactory evidence that the verdict is erroneous, substitute their impressions for the opinion of the jury." *Realty Bond & Mtg. Co.*, 19 Ga. App. at 188 (citation and punctuation omitted). Given the evidence, we cannot say that the jury's verdict "shock[s] the moral sense" so as to infer that the verdict of liability was the result of bias. Id.

9. *Remitted judgment.*

32

Finally, Chrysler argues that the trial court erred in failing to remit the damages awards sufficiently to bring them in line with prior awards in Georgia. But no two cases are exactly alike, so it may not be relevant to merely compare cases. See *St. Paul Fire &c. Ins. Co. v. Dillingham*, 112 Ga. App. 422, 424 (145 SE2d 624) (1965); *Colonial Stores v. Coker*, 77 Ga. App. 227, 234 (9) (48 SE2d 150) (1948). See also *Reliance Ins. Co. v. Bridges*, 168 Ga. App. 874, 889-890 (16) (311 SE2d 193) (1983) (physical precedent).

> As for the wrongful death damages,
>
> the value of the child's life must be established by the enlightened conscience of an impartial [factfinder] as applied to the evidence in the case, including testimony as to such child's age, life expectancy, precocity, health, mental and physical development, family circumstances, and from the experience and knowledge of human affairs on the part of the [factfinder].

*Collins v. McPherson*, 91 Ga. App. 347, 349 (1) (85 SE2d 552) (1954). As for the pain and suffering damages, "[t]he amount of damages . . . is governed by no other standard than the enlightened conscience of [the] impartial [factfinder]. And the defendant has a heavy burden . . . to establish that such a damage award is excessive."

33

*AT Systems Southeast v. Carnes*, 272 Ga. App. 671 (1) (613 SE2d 150) (2005) (citation and punctuation omitted).

Chrysler has not shown that the trial court manifestly abused his discretion in awarding the plaintiffs $30 million for their child's wrongful death and $10 million for his pain and suffering. See *Porter v. Tissenbaum*, 247 Ga. App. 816, 817 (1) (545 SE2d 372) (2001).

*Judgment affirmed. Miller, P. J., concurs. McMillian, J., concurs fully in Divisions 1, 2, 3, 4, 5, 6, 8, and 9, and in the judgment only in Division 7.*