S07G1208. IN RE SHERRI JEFFERSON.
(657 SE2d 830)

HUNSTEIN, Presiding Justice.

In *In re Jefferson*, 284 Ga. App. 877 (645 SE2d 349) (2007), the Court of Appeals affirmed in a split opinion a criminal contempt adjudication rendered in Glynn County Juvenile Court against attorney Sherri Jefferson arising from statements she made while representing a minor client in a delinquency proceeding. We granted certiorari to clarify the proper standard for determining whether a lawyer's comments during trial constitute contempt of court. Having set forth that standard below, we now vacate the judgment below and remand the case for further proceedings.

On August 9, 2005, Jefferson appeared in the last of a series of delinquency hearings in Glynn County Juvenile Court on behalf of a minor client, B. W. B. W. was charged as a party to the crime of aggravated battery and related offenses in connection with a shooting in which B. W. was alleged to have supplied the weapon and "egged on" the shooter. The record reflects that Jefferson repeatedly challenged the trial court's rulings upholding the prosecutor's hearsay objections to questions Jefferson posed regarding the contents of statements the alleged shooter made to police. At the conclusion of the August 9 hearing, B. W. was adjudicated delinquent, and a dispositional hearing was set for August 15, 2005.

At the end of the August 15 hearing, the trial judge issued a Notice of Contempt and Show Cause Order charging Jefferson with contempt, citing eight instances of allegedly contemptuous conduct during the course of the delinquency proceedings, including inappropriate facial expressions, disrespectful tone of voice, and improper statements. Soon thereafter, the trial judge recused himself, and another judge was designated to hear the contempt citation. The contempt hearing was held on February 14, 2006, at which Jefferson was represented by both a public defender and a local attorney. After hearing testimony from Jefferson and reviewing the transcript from

the delinquency proceedings, the judge found two of the eight statements in question to have been contemptuous on the basis that the statements impugned, disparaged, and attacked the impartiality of the court and thereby undermined its authority, respect, and dignity. Jefferson was sentenced to a total of 30 days' imprisonment in the Glynn County Jail (10 days for the former statement and 20 days consecutive for the latter) and a $500 fine.

The Georgia Constitution provides that "[e]ach court may exercise such powers as necessary in aid of its jurisdiction or to protect or effectuate its judgments." Ga. Const. of 1983, Art. VI, Sec. I, Par. IV. Premised on this constitutional foundation, this Court has long held that the contempt power is inherent in every court and, as such, is not subject to abridgement or restriction by the Legislature. *Bradley v. State*, 111 Ga. 168 (1), (2) (36 SE 630) (1900). Although there do exist various statutory provisions purporting to define the parameters of contempt, "[t]he broad authority of a judge to preserve good order in the courtroom by the use of contempt power is well recognized and must be preserved if the courts are to perform their public duty." *Garland v. State of Ga.*, 253 Ga. 789, 791 (2) (325 SE2d 131) (1985).[1]

We have previously held that statements by counsel may be found contemptuous where they pose a "clear and present danger to orderly administration of justice. [Cit.]" *Garland*, supra, 253 Ga. at 790 (2). Both the majority and the dissent below relied on the "clear and present danger" language in *Garland*, supra, but they disagreed on whether this standard was actually met. *In re Jefferson*, supra, 284 Ga. App. at 880 (2), 881 (Bernes, J., dissenting). The fractured result is unsurprising given the variable outcomes in prior reported cases in this State. Compare *White v. State of Ga.*, 218 Ga. 290 (2) (b), (c) (127 SE2d 668) (1962) (affirming contempt conviction for "ill-chosen" remark and comment implying counsel questioned judge's impartiality); *Crudup v. State of Ga.*, 106 Ga. App. 833 (2) (129 SE2d 183) (1962) (affirming contempt conviction where counsel persisted in seeking leave to call witness in face of three adverse rulings on the issue); *Salem v. State of Ga.*, 101 Ga. App. 905 (5) (115 SE2d 447) (1960) (affirming contempt conviction where counsel posed voir dire questions suggesting unfairness in pretrial proceedings); *White v. State of Ga.*, 71 Ga. App. 512 (31 SE2d 78) (1944) (affirming contempt conviction where counsel remarked on judge's personal antagonism for him), with *Calhoun v. Findley*, 168 Ga. App. 634, 636-637 (309 SE2d 907) (1983) (reversing contempt conviction where counsel

---

[1] Thus, notwithstanding statutes prescribing arguably different standards for contempt in different courts, see OCGA §§ 15-1-4 (a), 15-11-5, we hold expressly that the standard for contempt set forth in this opinion shall be uniformly applicable in the courts of this State, regardless of the particular forum.

persisted in seeking leave to "make a showing" and "talk to the court reasonably" despite numerous admonitions to proceed to a different subject); *In re McLarty*, 152 Ga. App. 399 (2), (4) (263 SE2d 194) (1979) (reversing contempt conviction where counsel alleged judicial bias against women lawyers in motion to recuse but affirming contempt for counsel's failure to respond to direct question from the court).[2]

Not only does the "clear and present danger" standard lead to inconsistent results, its focus on balancing the need for courtroom order with the attorney's right to free expression fails, in the context of courtroom advocacy, to adequately consider the represented party's rights to counsel and due process of law, the raison d'etre of such advocacy. See *In re McConnell*, 370 U. S. 230, 236 (82 SC 1288, 8 LE2d 434) (1962) (strenuous and persistent advocacy should not constitute contempt unless it blocks court's performance of judicial duty, as "it is . . . essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases"). We therefore deem it necessary to articulate a more complete standard for contempt in the context of courtroom advocacy. At the outset, we note that "[c]riminal contempt is a crime in the ordinary sense." *Bloom v. Illinois*, 391 U. S. 194, 201 (II) (88 SC 1477, 20 LE2d 522) (1968). "Like all crimes, contempt has an act requirement (actus reus) and a mental component (mens rea)." Ronald J. Rychlak, Direct Criminal Contempt and the Trial Attorney: Constitutional Limitations on the Contempt Power, 14 Am. J. Trial Advoc. 243, 265 (Fall 1990). Thus, we find it useful to examine these two elements separately.

As to the "act" element, our extensive examination of the law of contempt reveals some debate regarding the extent to which a contempt finding requires proof of some *actual* interference with a litigant's ability to receive a fair trial or *actual* obstruction of the judge's ability to administer justice. The federal courts and some state jurisdictions purport to require actual obstruction, see, e.g., *In re McConnell*, supra, 370 U. S. at 234 (federal contempt statute requires actual obstruction); *State v. Harper*, 376 SE2d 272 (SC 1989)

---

[2] Georgia courts are apparently in good company with respect to their unpredictability in adjudicating contempt. As noted by one commentator:

> Presently, the standards governing both the limits of acceptable advocacy and the scope of the contempt power are haphazard and imprecise. Although numerous appellate decisions purport to specify standards for applying the contempt power, their open-ended and ill-defined criteria make it impossible to predict, except in the most obvious instances, whether an attorney's conduct is punishable.

(Footnotes omitted.) Louis S. Raveson, Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power – Part One: The Conflict Between Advocacy and Contempt, 65 Wash. L. Rev. 477, 482-483 (July 1990) (hereinafter, "Raveson, Part One").

(reversing contempt conviction because no obstruction); *Hawthorne v. State*, 611 So2d 436 (Ala. Crim. App. 1992) (reversing contempt conviction because no evidence of obstruction), while other states require a mere imminent threat to the administration of justice. See, e.g., *State of Ohio v. Kitchen*, 714 NE2d 976, 980 (Ohio Ct. App. 1998) ("[a] court may only punish conduct as a direct contempt if that conduct constitutes misbehavior that poses an imminent threat to the administration of justice. [Cit.]"); *State of West Virginia v. Boyd*, 276 SE2d 829, 832-833 (W. Va. 1981) ("obstruction has to be imminent and not remote"). However, as one observer has noted, in practice,

> there may be no meaningful distinction between an actual obstruction, as defined by the federal courts, and an imminent threat of obstruction, because even an actual obstruction rarely consists of a consummated harm. If we limit definition of actual obstruction to harms such as physical disruptions of a trial, or misconduct actually affecting the trial's outcome or requiring a mistrial, we could clearly distinguish between an actual interference with justice and the imminent threat of such interference. However, the definition of obstruction, as presently and properly applied by those jurisdictions using it, is not so limited. Rather, the actual obstruction standard responds, in relation to advocacy, for the most part, to the *probabilities* of harm befalling the administration of justice from conduct such as disrespect, failure to heed an order to stop argument, and the revelation of improper information to the jury.

Raveson, Part One, supra, 65 Wash. L. Rev. at 517. Thus, in recognition of the blurred and perhaps nonexistent distinction in the context of courtroom advocacy between a so-called "actual" obstruction and the "imminent threat" of one, we are persuaded that the "imminent threat" standard is the more cogent approach to defining the "act" element of contempt.

Regarding the "intent" element, some courts have purported to require a finding that the attorney actually intended the offending statements to be obstructive, or at least knew that the statements would have an obstructive effect. See, e.g., *In re Brown*, 454 F2d 999, 1007 (D.C. Cir. 1971). This approach is problematic because of the difficulty in proving an attorney's subjective ill intent when the contemnor can almost always argue that the offending statements were merely a means to advance the client's interests. See Kimberly Morihara, An Evaluation of the Summary Contempt Power of the Court: Balancing the Attorney's Role as an Advocate and the Court's Need for Order, 19 U. Haw. L. Rev. 145, 173 (Spring 1997). Thus, we

find more helpful, and hereby adopt, a more objective formulation of intent, whereby contempt may be found only where the attorney "knows or reasonably should be aware in view of all the circumstances, especially the heat of controversy, that he is exceeding the outermost limits of his proper role and hindering rather than facilitating the search for truth." *In re Dellinger*, 461 F2d 389, 400 (7th Cir. 1972). This standard both recognizes the importance of protecting — and not preemptively discouraging — zealous advocacy while preventing an attorney's self-serving (and difficult to disprove) claim of good faith from absolutely immunizing the contemnor from contempt in egregious cases.

Thus, to summarize, we hold that an attorney may be held in contempt for statements made during courtroom proceedings only after the court has found (1) that the attorney's statements and attendant conduct either actually interfered with or posed an imminent threat of interfering with the administration of justice and (2) that the attorney knew or should have known that the statements and attendant conduct exceeded the outermost bounds of permissible advocacy. Because contempt is a crime, the evidence must, of course, support these findings beyond a reasonable doubt. See *In re Burton*, 271 Ga. 491 (3) (521 SE2d 568) (1999).

To assist in its analysis, it may be helpful for the court to consider the following non-exhaustive list of factors: (1) the extent to which the attorney was put on notice prior to the contempt citation that a continuation of the offending statements would constitute contempt; (2) the likely impact of the offending statements on the deliberations of the factfinder, which calculus incorporates both the nature and timing of the offending conduct and whether the factfinder is a judge or jury; (3) whether the offending statements occurred as an isolated incident or constituted a pattern of behavior; (4) the significance of the particular issue in question to the case as a whole and the relative gravity of the case; and (5) the extent, if any, to which the trial court provoked the offending statements with its own improper statements. See Louis S. Raveson, Advocacy and Contempt — Part Two: Charting the Boundaries of Contempt: Ensuring Adequate Breathing Room for Advocacy, 65 Wash. L. Rev. 743 (IV) (D-I) (Oct. 1990).

Finally, in light of the important constitutional rights involved, we are of the opinion that, in adjudicating a case of possible contempt, "doubts should be resolved in favor of vigorous advocacy. [Cit.]" *United States ex rel. Robson v. Oliver*, 470 F2d 10, 13 (7th Cir. 1972). Indeed,

> where advocative expression is at issue, the need for such expression cannot merely be balanced *against* the court's interest in maintaining the integrity and continuity of a

trial; advocacy is itself essential to the court's achieving that interest. Therefore, any balancing test for determining whether advocacy interferes sufficiently with justice to make it punishable must also consider the positive value of the advocacy to the very interest sought to be protected by the contempt power.

(Footnotes omitted.) Raveson, Part One, supra, 65 Wash. L. Rev. at 515-516. Thus, because vigorous advocacy is essential not only to the preservation of individual rights but also to the integrity of the judicial system whose truth-seeking process is sought to be protected through the exercise of the contempt power, courts must be judicious in their approach to adjudicating contempt. In considering whether to hold an attorney in contempt, the court should always assess whether there are other correctives sufficient to address the problematic conduct in question. See *In re McConnell*, supra, 370 U. S. at 234 (contempt power should be limited to least possible power adequate to end proposed).[3] And we echo the United States Supreme Court's admonition that trial judges " 'must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.' [Cit.]" *In re Little*, 404 U. S. 553, 555 (92 SC 659, 30 LE2d 708) (1972).

Turning back to the case at hand, because the decisions below were rendered without the benefit of the standard enunciated above, we find that the appropriate course is to remand this case for further consideration in light of the above standard. Accordingly, we hereby vacate the judgment of the Court of Appeals and remand the case with direction to return it to the trial court for consideration in conformity with the above.

*Judgment vacated and case remanded with direction. All the Justices concur, except Melton, J., who concurs in the judgment only.*

DECIDED FEBRUARY 25, 2008.

*Sherri J. Jefferson,* pro se.
*Stephen D. Kelley, District Attorney, Thurbert E. Baker, Attorney General, Charles C. Olson,* for appellee.
*Rhonda Brownstein, Carl P. Greenberg, Jimmonique R. S. Rodgers,* amici curiae.

---

[3] For example, issuing a warning to counsel or calling a recess may curtail troublesome conduct; issuing limiting instructions may curb the impact of prejudicial information made known to the jury; and publicly chastising disrespectful conduct may help sustain the court's authority. See Rychlak, supra, 14 Am. J. Trial Advoc. at 281-282.