### A09A0223. HAMILTON et al. v. SHUMPERT et al.
(682 SE2d 159)

PHIPPS, Judge.

Within days of being seen by a hospital's emergency room physician and her own primary care physician for chest pain and related symptoms, Myra Hamilton suffered heart failure, loss of her kidneys, and other severe complications. She and her husband filed a medical malpractice suit. They named as defendants: Paul K. Shumpert, M.D., the emergency room doctor who treated her; NW Georgia Emergency Medical Associates, P.C., the company for which he worked; Redmond Park Hospital, Inc. d/b/a Redmond Regional Medical Center, the hospital where she was seen by Shumpert; Billy G. Chacko, M.D., Hamilton's primary care physician and internist; Billy G. Chacko, M.D., P.C., Chacko's professional corporation; and Harbin Clinic, LLC, where Chacko worked. The Hamiltons dismissed their claims against the hospital; the case proceeded to trial; and the jury found for the defendants.

The Hamiltons appeal the judgment entered upon the jury verdicts. They contend that the trial court erred by denying their motion to impose sanctions against defense counsel for certain conduct during discovery, by curtailing their use of an exhibit during cross-examination of a defense medical expert, and by failing to give a curative instruction and rebuke defense counsel regarding improper remarks in closing argument. Because the Hamiltons have

---

of a b[----]" and threatened to kick his "ass"), abrogated on other grounds by *Golden Peanut Co. v. Bass*, 249 Ga. App. 224 (547 SE2d 637) (2001).

shown no reversible error, we affirm.

On April 5, 2003, Hamilton experienced fatigue, shortness of breath, chest pain, and heart palpitations. She called the Harbin Clinic to speak with Chacko. The office was closed that Saturday, but one of Chacko's partners at the Harbin Clinic returned her call. Hamilton heeded that doctor's advice to report to a hospital's emergency department.

At Redmond Regional Medical Center, Hamilton was seen by Shumpert. He noted her high blood pressure, ordered an EKG test, ordered lab work, and ordered and reviewed an x-ray of her chest. He diagnosed Hamilton with bronchitis and possibly pneumonia, prescribed antibiotics, then discharged her with instruction for her to follow-up with her primary care physician in two days.

On Monday, Hamilton felt worse, despite taking the prescribed medication. She went to see Chacko that day, reporting her ongoing symptoms and recent visit to the emergency department. Chacko noted that Hamilton's blood pressure was elevated. He ordered tests on Hamilton's blood and urine samples. Chacko also reviewed the results of Hamilton's blood count and chemistry reports, as well as the EKG that had been performed at Redmond two days earlier. He did not review the chest x-ray because he did not know about it. Chacko scheduled Hamilton to see a pulmonologist that Thursday.

But by Tuesday morning, Hamilton's ability to breathe had worsened. She called Chacko's office and was advised to report to an emergency department. On the way there by ambulance, Hamilton suffered a respiratory arrest. She remained hospitalized through late May for numerous severe complications, including congestive heart failure and the loss of both kidneys.

Meanwhile, on April 10, Chacko consulted with a rheumatologist at the Harbin Clinic who had seen Hamilton the previous October and again in January 2003. During those visits with Hamilton, the rheumatologist had considered scleroderma as a possible diagnosis of her condition. After a kidney biopsy was obtained during the latter part of April, Hamilton was diagnosed with scleroderma renal crisis.

In their lawsuit, the Hamiltons alleged that Shumpert and Chacko had breached the standard of care by failing to adequately perform and evaluate tests between April 5 and April 7 and thus failing to give Hamilton available medications that would have prevented the heart failure and protected her kidneys from damage. They presented evidence that the tests performed at the emergency department revealed elevated blood pressure, an abnormal EKG, an abnormal chest x-ray, and abnormal renal function.

The defendants denied liability on the ground that, under the circumstances, the standard of care did not require the defendant doctors to diagnose and thus treat, within the April 5-7 time frame,

Hamilton's underlying condition of scleroderma renal crisis. A defense medical expert, who was an internist with a speciality in rheumatology, described scleroderma as a connective tissue disease with a "hallmark" manifestation of the presence of tight, hard skin. In some cases, scleroderma affects internal body parts, such as the lungs, heart and kidneys. In very rare cases, individuals suffer the internal damage caused by scleroderma without also having the characteristic skin changes. These persons have what is called scleroderma sine scleroderma. The expert testified that Hamilton suffered from this condition. According to the expert, "Scleroderma renal crisis is one of the few ultra-emergencies in scleroderma. . . . [I]t's an acute onset of very severe high blood pressure that can cause renal failure and kidney failure and death." She further testified that this condition is not predictable.

1. The Hamiltons contend that the trial court erred by denying their motion pursuant to OCGA § 9-11-37 that sought the imposition of sanctions based upon ex parte communications in 2006 between Shumpert's attorney and a cardiologist. This doctor had treated Hamilton in April 2003, during his employment with the Harbin Clinic, which ended in August 2003. The Hamiltons assert that the communications violated the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[1] "A trial court has broad discretion to control discovery, including the imposition of sanctions, and this Court will not reverse the trial court's ruling on such matters absent the showing of a clear abuse of discretion."[2]

The record shows that, pursuant to OCGA § 9-11-9.2, Hamilton signed and filed with the complaint in 2005 a medical authorization form wherein she granted the defendants' attorneys the "right to discuss the care and treatment of Plaintiff, Myra Lynn Hamilton, with all of [her] physicians." The Hamiltons argue that they should not be bound by this authorization in light of *Moreland v. Austin.*[3]

In that case, the Supreme Court of Georgia clarified that HIPAA applies to ex parte communications between defense counsel and heathcare providers, that HIPAA is more stringent than Georgia law, and that it therefore "preempts Georgia law with regard to ex parte communications between defense counsel and plaintiff's prior treating physicians because HIPAA affords patients more control over their medical records when it comes to informal contacts between litigants and physicians."[4] The Supreme Court instructed, "Thus, in order for

---

[1] 42 USC § 1320d et seq.

[2] *Smith v. Glass*, 273 Ga. App. 327, 328 (615 SE2d 172) (2005) (citations and punctuation omitted).

[3] 284 Ga. 730 (670 SE2d 68) (2008).

[4] Id. at 733.

defense counsel to informally interview plaintiff's treating physicians, they must first obtain a valid authorization, or court order or otherwise comply with the provisions of 45 CFR § 164.512 (e)."[5]

Despite the relevant HIPAA protections, which were enacted in 2003,[6] Hamilton provided an authorization form that did not in any way restrict discussions between defense counsel and Hamilton's former treating physicians.[7] Moreover, Shumpert's attorney contacted Hamilton's prior treating cardiologist at a time when arguably the applicability of HIPAA to ex parte communications was uncertain. Under these circumstances, the trial court did not clearly abuse its discretion in denying the Hamiltons' motion to impose sanctions against defense counsel.[8]

2. The Hamiltons contend that the trial court erred by curtailing their use of a note dictated as part of Hamilton's medical records by the rheumatologist at the Harbin Clinic who had seen Hamilton in October 2002 and January 2003. According to the Hamiltons, the note showed that during the January visit, the rheumatologist had considered that Hamilton may have had some form of scleroderma. They argue that the note was therefore proper impeachment and rebuttal evidence because it demonstrated an "important contradiction between what the treating doctors actually thought and recorded in the medical records compared to what Defendants' one rheumatology expert 'assumed' they thought."

During cross-examination, the defense rheumatology expert stated that she did not "think [the treating rheumatologist] was considering diffused scleroderma." This response led to the Hamiltons putting the note at issue on display for the jury. The defense objected, arguing that the Hamiltons were attempting to use the note in an impermissible manner and pointing out that the note had

---

[5] Id.

[6] For general background regarding the pertinent regulations promulgated pursuant to HIPAA, see *Austin v. Moreland*, 288 Ga. App. 270, 273-274 (2) (653 SE2d 347) (2007), rev'd on other grounds, *Moreland v. Austin*, supra.

[7] Cf. *Allen v. Wright*, 282 Ga. 9 (644 SE2d 814) (2007) (patient filing medical malpractice action executed authorization to release medical records in ostensible compliance with OCGA § 9-11-9.2, but refusing under HIPAA to authorize defense attorneys to communicate with her treating physicians outside the presence of and without prior notification to her lawyer); *Northlake Medical Center v. Queen*, 280 Ga. App. 510, 511 (1) (634 SE2d 486) (2006) (authorization form filed with complaint did not provide that defense attorneys were authorized to "obtain and disclose protected health information contained in medical records," but instead "maintain[ed] that (HIPAA) preempt[ed] State law, including the provisions of OCGA § 9-11-9.2" and advised the recipient health care provider that "you are requested not to furnish any of such information, in any form to anyone, without express written authorization from me or my attorneys").

[8] See *Moreland v. Austin*, supra at 734 (where defense counsel contacted plaintiff's prior treating physicians at a time when the applicability of HIPAA to ex parte communications was uncertain, a trial court would be well-advised to avoid an extreme sanction).

been written on April 10 by the treating rheumatologist after reflecting upon his visit with Hamilton the previous January. At a bench conference, Hamilton's counsel explained that the treating rheumatologist had included in his note that, during that previous January, he "felt that she had a probable evolving case of Crest syndrome or diffuse scleroderma." After hearing additional argument, the court ordered that the note be taken off display, remarking that the Hamiltons had already called the treating rheumatologist for cross-examination in their case in chief.

The record shows that, during their examination of the treating rheumatologist, the Hamiltons asked the doctor about his October and January visits with Hamilton. He testified that during his October 2002 evaluation of her, he considered "evolving scleroderma" as a possibility, and he identified a trial exhibit as his handwritten note showing so. The rheumatologist also identified another exhibit as his dictated note concerning the same matter. In that note, the doctor recorded, "There has been a question of evolving connective tissue disease, specifically limited scleroderma." The rheumatologist was further asked whether he had mentioned any other possible type of scleroderma in the note. He responded, "Well in my assessment I wrote down, certainly lupus, mixed connective tissue disease, scleroderma and limited scleroderma are all in the differential diagnosis. So I mentioned diffuse scleroderma." The rheumatologist testified further that, when Hamilton returned in January 2003, he recorded in a note his assessment of "probable evolving Crest syndrome or scleroderma." And he identified a trial exhibit as this note. Upon further questioning about whether he had referenced in his October or January notes "sine scleroderma," he answered no. He explained:

> There wouldn't be any references for sine scleroderma because it requires basically a pathological diagnosis, the piece of an organ. And . . . clinically she did not have scleroderma and basically sine scleroderma means scleroderma without scleroderma. So she didn't have skin changes and I didn't have a piece of an organ that would permit me to make such a diagnosis.

"Control of the nature and scope of cross-examination of a witness is a matter within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion."[9]

---

[9] *Barngrover v. Hins*, 289 Ga. App. 410, 411 (1) (657 SE2d 14) (2008) (citation and punctuation omitted).

Because the record shows that the Hamiltons were afforded ample opportunity to cross-examine the rheumatologist regarding his impressions at the time of his visits with Hamilton and because the information cited in the April 10 note was cumulative of what the rheumatologist had already testified and of his other notes shown to the jury, we find no reversible error in the trial court's curtailment of the use of the April 10 note.[10]

3. The Hamiltons contend that the trial court erred by refusing to give a curative instruction or rebuke defense counsel in the jury's presence in response to impermissible remarks made by one of the defense attorneys during closing argument. The Hamiltons complain of the following remarks: "I know that [the plaintiffs' lawyer] is going to probably ask you for an awful lot of money. A lot of lawyers ask for a lot of money and hope to get a percent of it." Without objection, the attorney went on to complete the closing argument.

At the conclusion of that particular closing argument, the court excused the jury out of the courtroom for a ten-minute break. Plaintiffs' counsel asked the trial judge, "[W]hat are we going to do about [the defense counsel's] comment that we will get a percentage?" The lawyer who had just given the closing argument denied having made or implied such a reference. The court agreed that the cited remarks could not reasonably be interpreted as commenting on a contingency fee recovery. The court therefore denied the plaintiffs' request for a curative instruction, explaining that it found nothing improper about what was said and that an instruction to the jury would needlessly highlight the remarks. The trial proceeded with the plaintiffs' final closing argument.

Arguing that the trial court erred because the remarks impermissibly put a potential contingency fee in issue, the Hamiltons cite OCGA § 9-10-185:

> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds.

Counsel is permitted wide latitude in closing argument, and defining the bounds of such argument is within the trial court's

---

[10] See *Clark v. City of Kennesaw*, 237 Ga. App. 42, 45 (2) (514 SE2d 701) (1999) (where excluded evidence would have been merely cumulative of evidence admitted without objection, no abuse of discretion was shown).

discretion.[11] However, the law forbids injecting into a case, by way of closing argument, facts not in the record and calculated to prejudice the opposing party.[12] Thus,

> a jury may not generally consider plaintiff's attorney fees when awarding damages. . . . The source of payment of attorney fees is irrelevant to the issue of damages. Evidence of it would be inadmissible, and argument on it is *doubly wrong*. It is not a subject of legitimate concern within the scope [of the jury's deliberations].[13]

Accordingly, this court has consistently condemned such argument as improper.[14] In the instant case, any contingency fee agreement had no relevance to any issue of liability or damages in the case.

Even assuming that defense counsel's remarks exceeded the permissible bounds of propriety,[15] there was no timely objection. The time to object is "when the impropriety occurs at trial."[16] In *Butler v. State*,[17] where the defendant did not object to the prosecutor's comment "at the time it was made," but waited until the end of the closing argument to move for a mistrial,[18] the Supreme Court of Georgia held that the objection and motion for mistrial were untimely.[19] Soon thereafter, the Supreme Court explained in *Mullins v. Thompson*[20] that in *Butler* it had "rejected the notion that a motion for mistrial based upon an improper closing argument can be made *after* closing argument, and held, to the contrary, that such a motion

---

[11] *Lillard v. Owens*, 281 Ga. 619, 622 (2) (641 SE2d 511) (2007).

[12] *Murphy v. State*, 203 Ga. App. 152, 154 (2) (416 SE2d 376) (1992) (full concurrence in Division 2).

[13] *Stoner v. Eden*, 199 Ga. App. 135, 137 (1) (404 SE2d 283) (1991) (punctuation omitted; emphasis supplied).

[14] See, e.g., *Booker v. Older Americans Council of Middle Ga.*, 278 Ga. App. 407 (629 SE2d 69) (2006) (finding as improper the defense counsel's remarks in closing argument that "this case is about greed and greed on top of greed . . . everybody sitting at the table with [the plaintiff] has a financial interest in the outcome of this case") (punctuation omitted); *Stoner*, supra at 137-138 (1) (2) (finding "totally improper" and of the type warranting "explicit rebuke of counsel" defense counsel's remarks in closing argument that the plaintiff's attorney was attempting to inflame "your [the jurors'] passions so you will go in the jury room and render a punitive verdict in this case, and his piece will be just a little bit bigger and a little bit bigger, and the higher it goes the higher the fee").

[15] See *Booker*, supra at 408; *Stoner*, supra at 137.

[16] *Mullins v. Thompson*, 274 Ga. 366, 367 (2) (553 SE2d 154) (2001).

[17] 273 Ga. 380 (541 SE2d 653) (2001).

[18] The motion for mistrial was made at the end of the *prosecutor's* closing argument, as opposed to all closing arguments. See id. at 386 (Carley, J., concurring).

[19] Id. at 383-384 (8).

[20] Supra.

must be made *at the time* the improper argument is uttered."[21] Since those cases, both the Supreme Court and this court have consistently held that motions for mistrial and objections based upon improper closing argument are untimely when first made after the closing argument has concluded.[22]

The Hamiltons did not interpose an objection at the time the remarks were made; they waited until the end of the closing argument. Although their objection was apparently moments after the cited remarks and even before the trial had advanced to either another phase or another (here, the plaintiffs' final) closing argument,[23] under *Butler* and its progeny, the Hamiltons' objection was untimely.

"When, as here, no timely objection is interposed, the test for reversible error is whether the improper argument in reasonable probability changed the result of the trial."[24] The Hamiltons have not demonstrated, and our review of the record does not convince us, that there is such reasonable probability here.

*Judgment affirmed. Smith, P. J., and Bernes, J., concur.*

DECIDED JULY 15, 2009 ▆▆▆▆▆▆▆▆▆▆

*Lamar, Archer & Cofrin, David W. Davenport, John W. Crongeyer, Robert K. Finnell*, for appellants.

*Carlock, Copeland & Stair, Thomas S. Carlock, Eric J. Frisch, Brinson, Askew, Berry, Seigler, Richardson & Davis, Robert L. Berry, Jr., Stephen B. Moseley*, for appellees.

---

[21] Id. at 367 (2) (citation omitted; emphasis in original).

[22] See, e.g., *Moxley v. Moxley*, 281 Ga. 326, 328 (6) (638 SE2d 284) (2006); *Brown v. State*, 278 Ga. 544, 547 (6) (604 SE2d 503) (2004); *Boyd v. State*, 275 Ga. 237, 238 (3) (564 SE2d 185) (2002); *Warner v. State*, 299 Ga. App. 56, 62 (5) (681 SE2d 624) (2009); *Fradenburg v. State*, 296 Ga. App. 860, 861-863 (676 SE2d 25) (2009); *Hernandez v. State*, 291 Ga. App. 562, 564 (1) (662 SE2d 325) (2008); *Booker*, supra at 408-409.

[23] The transcript places the improper remarks at the 29th page of a 31-page closing argument.

[24] *Mullins*, supra at 367 (citations and punctuation omitted); see *Moxley*, supra.