**THIRD DIVISION
GOBEIL,
COOMER and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 13, 2019**

# In the Court of Appeals of Georgia

A18A1672. HILLMAN v. ALDI, INC.

A18A1673. HILLMAN v. ALDI, INC.

GOBEIL, Judge.

These companion appeals arise out of a premises liability action brought against ALDI, Inc. by Rubie Hillman for injuries Hillman allegedly sustained while shopping at an ALDI grocery store. Hillman's attorney was found in contempt by the trial court after he twice asserted during his closing argument that ALDI had spoliated video evidence of the incident giving rise to Hillman's claims. The jury thereafter returned a verdict in favor of the defense, and in Case No. A18A1673, Hillman appeals from the order of judgment entered on that verdict. Hillman asserts that the trial court erred in: (1) failing to limit, over Hillman's objection, the cross-examination of Hillman's son and thereafter denying Hillman's motion for a curative

instruction; (2) admitting two of ALDI's exhibits without requiring ALDI to lay a proper foundation; (3) limiting Hillman's cross-examination of the ALDI store manager; and (4) refusing to allow Hillman's attorney to argue in closing that ALDI had destroyed video evidence of the incident. In Case No. A18A1672, Hillman appeals the order of contempt entered against her attorney, arguing that the evidence failed to support a finding of contempt. For reasons explained more fully below, we find no reversible error in any of the trial court's evidentiary rulings, and we therefore affirm the judgment entered on the jury's verdict in Case No. A18A1673.

In Case No. A18A1672, we find that the trial court failed to apply the correct evidentiary standard in imposing summary criminal contempt on Hillman's attorney and also failed to make the factual findings necessary to support its contempt order. Accordingly, in that case, we vacate the order of contempt and remand for reconsideration and, if warranted, entry of a new contempt order that complies with the requirements set forth in *In re Jefferson*, 283 Ga. 216 (657 SE2d 830) (2008).

On appeal from a judgment entered on a jury's verdict, we construe the evidence in the light most favorable to that verdict. *Smith v. Norfolk Southern Railway Co.*, 337 Ga. App. 604, 605 (788 SE2d 508) (2016). So construed, the relevant facts are set forth below.

2

*The Incident Leading to Hillman's Alleged Injuries*

In August 2014, Hillman, who was then approximately 79 years old, was shopping for groceries at an ALDI store in Conyers. As Hillman was looking at vegetables in the store's produce section, an ALDI employee was re-stocking the produce, taking the new inventory from boxes that were stacked on a wooden pallet. One or more of the empty cardboard boxes fell and struck Hillman, pushing her into the produce display case and leaving a large scrape on her lower left leg. Because she had her back turned, Hillman did not know how the boxes fell.

The employee from the produce area went to the store manager and reported the incident, and the manager then investigated. By the time the manager spoke with Hillman, Hillman had begun to experience a burning sensation in her leg, describing the sensation as feeling "like fire [being] shoved up my leg." The manager brought Hillman an ice pack for her leg and, based on information provided by Hillman and the produce-area employee, the manager filled out an accident report form for the store.

The store manager testified that although she did not witness the incident, the scene immediately afterwards led her to conclude that Hillman was hit by empty boxes. She explained that the produce area was clean and that if the boxes had

contained produce, items from the boxes would have spilled onto the floor. The manager further testified as to her belief that the boxes that fell had been stacked on the floor and not the pallet. According to the manager, per the store's practice, any employee restocking the area would take a full box from the pallet, empty it, and then set the empty box to the side of the pallet and onto the floor.

During his cross-examination of the store manager, Hillman's attorney asked her: "Do you think if the ALDI employee . . . had stacked the boxes [in such a way] that they ended up falling over and . . . hitting a customer, do you think that ALDI would be [at fault]?" Defense counsel objected because the question assumed facts not in evidence, and the trial court sustained the objection. Hillman's attorney thereafter began to pose a different question, stating, "if we can assume that an ALDI employee is the one that . . . stacked the boxes," and defense counsel again objected on the grounds that this question also assumed facts not in evidence. Defense counsel made a similar objection when Hillman's attorney asked the manager: "Do you have any reason to believe anybody but an ALDI employee stacked those boxes on the floor?" The trial court sustained both objections.

The store manager also testified that the store had video surveillance cameras throughout the building and that the cameras were programmed to record "on a loop,"

4

meaning that eventually video would be recorded over if not preserved. The manager could not say how much time had to lapse before video was recorded over, and explained that it would be the district manager's job to preserve any video of the incident and forward it to ALDI's counsel. When shown the accident report she completed, the manager acknowledged that she had circled the "yes" response next to the question, "surveillance video of the incident." When shown the report filled out by the district manager regarding Hillman's accident, the store manager acknowledged that a note at the top of the report stated "sending video." The store manager, however, did not know whether any video was in fact preserved or forwarded by the district manager.

*Hillman's Diagnosis and Treatment*

In the weeks after her injury, Hillman's left leg continued to hurt and she developed what she described as "little round knots" that ran down the inner leg, from approximately the knee to the ankle. Hillman testified that the pain in the area was "constant," would travel both upwards and downwards, and involved a stinging or burning sensation. On September 2, 2014, approximately three weeks after the incident, Hillman sought treatment for her leg at the Rockdale Medical Center emergency room. The ER physician made no formal diagnosis and instead referred

5

Hillman to her primary care physician. On September 5, 2014, Hillman saw the physician's assistant in her primary care physician's office, who diagnosed her with varicose veins, neuropathy, general leg pain, a contusion, claudication,[1] peripheral neuritis, and nerve root irritation at the S1, L4, and L5 vertebrae. The PA prescribed a compression hose for the left leg and recommended that Hillman undergo an ultrasound on her varicose veins. Hillman did not wear the support stocking, explaining that it caused the leg too much pain. There is no evidence that Hillman obtained the recommended ultrasound.

After experiencing no improvement in her symptoms, Hillman went to the emergency room at the Newton Medical Center, on September 25, 2014. When she presented at Newton Medical Center, Hillman complained of pain in both legs and her lower back. She underwent an x-ray of both her lumbar spine and her left leg, was diagnosed with neuropathy, and was referred back to her primary care physician. Additionally, Hillman was given several prescriptions for pain and inflammation. Hillman, however, did not take any of those medications, as she was concerned about

---

[1] Claudication is a peripheral artery disease that can result in a lack of blood flow and oxygen to the leg muscles which in turn causes pain and muscle cramps. The pain can be triggered by physical activity such as walking.

side effects. Hillman further explained that she never takes medicine, as she prefers to treat herself using herbs.

Approximately four weeks after the incident, Hillman retained counsel, who referred her for treatment at Regional Medical Group ("RMG"), where Hillman was treated by two different doctors. In October 2014, Hillman saw Dr. Srihari Malempati at RMG. In the paperwork she filled out at her initial visit to RMG, Hillman listed back pain as one of her chief complaints. During its case, ALDI offered the testimony of Dr. Malempati through his video deposition, taken in advance of trial. Although Dr. Malempati did not discuss Hillman's back pain with her, he did examine her lower spine, which showed a normal range of motion with some tenderness on the left side. He also ordered an EMG nerve study, which showed nerve root irritation at the left L4 and L5 and bilateral S1 levels and therefore indicated that Hillman had pinched nerves in her lower back. Dr. Malempati acknowledged that the nerves located at L4, L5, and S1 run down the legs, so pinched nerves in those areas could cause leg pain. Despite these facts, Dr. Malempati did not order an MRI of Hillman's lower back because, given Hillman's description of her left leg pain, he did not

believe it was related to the lower back.[2] . Based on his exam, Hillman's description of her symptoms, and the EMG study, Dr. Malempati diagnosed Hillman with a laceration, contusion, chronic pain, radiculopathy, and peripheral neuritis due to what he thought was an injury to the saphenous nerve.[3] Dr. Malempati explained that his diagnosis was consistent with Hillman's complaint of back pain, as an injury to the nerves in the calf could cause referred pain in the lower back.

Dr. Malempati referred Hillman to physical therapy and prescribed an anti-inflammatory, but Hillman did not take the prescribed medication. After 15 sessions of physical therapy, Hillman experienced some improvement in her symptoms, but still continued to suffer pain, especially when she engaged in physical activity. Unable to diagnose Hillman further, Dr. Malempati referred her to a second doctor at RMG, Angela Ashley.

At trial, Hillman offered the testimony of Dr. Ashley through her video deposition, taken in advance of trial. Hillman first saw Dr. Ashley in January 2015,

---

[2] Dr. Malempati explained that Hillman described the pain as involving paresthesias (or altered sensations), including the burning and tingling. And according to Dr. Malempati, a pinched nerve would not cause that type of pain.

[3] Radiculopathy refers to pain caused by a pinched nerve, while neuritis refers to the inflammation of the nerve. The saphenous nerve is located in the calf.

and reported that her pain had continued to worsen over time. Based on Hillman's symptoms and history since the incident, Dr. Ashley, who is a neurologist, made a preliminary diagnosis of Complex Regional Pain Syndrome ("CRPS"). Dr. Ashley explained that CRPS involves pain that is disproportionate to a patient's injury, changes in motor function, changes in skin thickness and color, and abnormal sweating in the area. It is a "diagnosis of exclusion," meaning that other potential causes of the pain had to be ruled out before the diagnosis could be made. The symptoms that Dr. Ashley relied on to reach Hillman's CRPS diagnosis included Hillman's report that even light touch to the leg was painful; an area of abnormal discoloration on Hillman's left leg; and Hillman's report of multiple types of "abnormal sensations," such as burning, a deep aching, and the feeling that something was "inside her leg." Additionally, Dr. Ashley opined that varicose veins generally do not cause the type of pain Hillman was experiencing, and the area in which Hillman was experiencing pain was inconsistent with her areas of nerve root irritation.

Dr. Ashley saw Hillman six times between January and August 2015, and during that time, Hillman's symptoms fluctuated. As long as Hillman refrained from physical activity, "she did pretty well," but her symptoms would worsen with

9

increased activity, including squatting or bending down. Although Hillman continued to refuse oral medications, in June 2015 she agreed to try Lidoderm patches, which contained an anesthetic medication and were applied to the skin. At her August 2015 visit to Dr. Ashley, Hillman reported "profound improvement" with the use of the Lidoderm patches. Dr. Ashley then discharged Hillman from the practice and directed her to follow up with her primary care physician or neurologist for further Lidoderm patches.

There was no evidence that Hillman sought any further treatment for her symptoms until May 2017, when she returned to Dr. Ashley. According to Dr. Ashley, Hillman returned because she was continuing to experience symptoms, more than two years after the accident. Dr. Ashley ordered a second EMG study, which again showed Hillman had nerve root irritation at the left L5 and S1 level.

*Expert Testimony for the Defense*

The defense presented the expert medical testimony of a physiatrist, meaning the expert was a physician with specialty training in physical medicine and rehabilitation. Having reviewed Hillman's medical records, the expert testified that in his opinion, Hillman did not suffer from CRPS, but instead suffered from pinched nerves in her lower back, an injury to the saphenous nerve, and/or varicose veins. The

physician explained that these diagnoses were consistent with Hillman's symptoms, and that CRPS was not consistent with those symptoms. The expert further testified that Hillman's improvement with the use of Lidoderm patches and without oral medication or injections indicated that she did not have CRPS. Additionally, the fact that Hillman did not experience pain when she refrained from physical activity was also inconsistent with CRPS, as a patient with that syndrome "would have significant pain just from the simplest of things, such as wearing a sock, or something rubbing up against the leg." The expert also explained that a patient suffering from CRPS could not go 22 months without receiving any type of treatment, as Hillman had done. Finally, the expert noted that both of the EMG studies performed on Hillman indicated pinched nerves in Hillman's lower back, in an area that was consistent with the pain in Hillman's leg. Thus, the expert opined that the most likely cause of Hillman's leg issues was a pinched nerve, but noted that RMG's physicians had failed to order the medical test (an MRI of the lumbar spine) that could have definitively confirmed or ruled out that diagnosis.

*RMG's Status as a "Lien-Based" Personal Injury Practice*

During his testimony, Dr. Malempati identified what was introduced at trial as defendant's exhibit 41, which was a copy of the "Frequently Asked Questions"

11

section of the RMG website. That document explained that RMG did not bill patients for medical care but instead provided "care on a lien basis," and explained that the patient's attorney would handle RMG's charges for medical services "when [the patient's] case settles." Dr. Malempati, who is also an attorney, testified that operating on a "lien basis" meant that RMG would be paid from any funds recovered by Hillman in the current lawsuit. Defense counsel also questioned Dr. Malempati about what was introduced at trial as defendant's exhibit 44, which was an invoice from Key Health Medical Solutions, Inc. sent to Hillman in care of her attorney.[4] With respect to that document, Dr. Malempati testified that he did not know whether Key Health provided "personal injury medical lien funding," and he did not know RMG's financial agreement with Key Health. According to Dr. Malempati, RMG paid him for his treatment of patients regardless of whether RMG received payment for those services.

Hillman objected to the admission of defendant's exhibits 41 and 44 on the grounds that ALDI had failed to lay a foundation for those documents. The trial court overruled those objections, relying on the parties' pretrial order and the fact that

---

[4] The invoice showed that RMG sold its lien in Hillman's case to Key Health.

12

Hillman had failed to object to those documents when Dr. Malempati was questioned about them during his deposition.[5]

During his cross-examination of Hillman's son, defense counsel asked him if he was aware that RMG operated a lien-based medical practice.[6] Hillman's attorney objected on the grounds that the question assumed facts not in evidence, but the trial court overruled the objection. Hillman's son then asked defense counsel for description of "lien-based" and defense counsel responded that "a lien-based medical practice actually means that if a patient of [RMG] is a plaintiff in litigation . . . concerning an injury . . . and that patient does not recover [either through settlement or an award of damages], . . . [RMG] will most likely not get paid for the services that [its physicians] rendered. . . ."

Hillman subsequently filed a written motion seeking a curative instruction telling the jury to disregard defense counsel's statements regarding lien-based medical practices. In support of that motion, Hillman argued that the questions posed to Hillman's son on this issue assumed facts not in evidence. At the hearing on that

---

[5] The portion of the pretrial order relied on by the trial court in overruling Hillman's objections is discussed infra, in Division 2.

[6] Hillman's son testified before the jury heard the testimony of Dr. Malempati on this subject.

13

motion, however, Hillman's attorney clarified that he was not objecting to the questions about the lien-based medical practice, but instead was seeking a curative instruction with respect to defense counsel's explanation of how a lien-based medical practice operates, as there was no evidence that RMG would be paid only if Hillman recovered damages. The trial court denied the motion and did not provide a curative instruction.

*Closing Argument and the Finding of Contempt*

During his closing argument, Hillman's attorney stated that ALDI had "destroyed evidence that was available." Defense counsel objected to this statement, and the trial court sustained the objection. Hillman's attorney then stated, "[ALDI] had possession of evidence" and defense counsel again objected. At a bench conference, the trial court told counsel that there was nothing in the record about evidence having been destroyed or withheld. The court then issued a curative instruction, and directed counsel to continue with his closing. Counsel then asked, "may I say that [ALDI] had possession," at which point the trial court ordered the jury removed from the room. The trial court then told Hillman's attorney:

> I have told you, specifically, not to speak about my rulings about evidence in front of the jury. Asking what you can and can't say

14

constitutes the speaking about my evidentiary rulings. If you don't know what you are to say in a courtroom, that is not something I can instruct you on. Moreover, the comment about [my evidentiary ruling] in front of the jurors is what I consider contempt. So I am going to give you a pass before imposing any sanctions on that this time. But if it happens again, I will impose monetary sanctions for speaking about evidentiary rulings in front of this jury.

When Hillman's attorney sought clarification about what argument he could make concerning the videotape of the incident, the trial court stated that it could not give counsel directions on how to do his job, that the court would not make anticipatory rulings, and that if defense counsel objected to his argument, the court would rule on that objection. The court then explained to Hillman's attorney that the question of whether evidence had been spoliated was "a legal determination that must be made by this [c]ourt"; that the court had not been called on to make such a determination; and that spoliation of evidence therefore could not be argued during closing.

When the jury returned, the trial court issued a second curative instruction to the jury, telling them that any reference to the destruction of evidence by ALDI was a false statement, as "there has been no evidence of the destruction of evidence by

ALDI." Hillman's attorney thereafter argued to the jury, without objection, that ALDI failed to keep the video evidence that may have proved whether it was at fault.

Towards the end of his closing argument, Hillman's lawyer began a PowerPoint presentation, during which he stated that ALDI "had a videotape that [if it had] preserved, would [have] been able to show whether ALDI was at fault or not." At the time Hillman's attorney made this argument, the PowerPoint slide on display contained the following statement: "[ALDI] had a videotape that they would have . . . preserved had it shown that ALDI was not at fault." Defense counsel objected to both the argument and the slide, and the trial court sustained the objection and ordered the PowerPoint turned off. The trial court then issued a curative instruction to the jury, found Hillman's attorney in contempt, and imposed a $500 fine against the lawyer.

Following closing argument, the case was given to the jury, which returned a verdict for the defendant. These appeals followed.

*A18A1673.*

1. Hillman argues that the trial court erred (a) in overruling her objection to questions posed to Hillman's son by defense counsel regarding the son's knowledge of RMG as a lien-based practice; and (b) in thereafter denying Hillman's motion for

16

a curative instruction. With respect to both of these claims of error and the claims of error discussed infra in Divisions 2 and 3, we note that "the admission of evidence lies in the sound discretion of the trial court." *Thomas v. Emory Clinic*, 321 Ga. App. 457, 458 (1) (a) (739 SE2d 138) (2013) (citation and punctuation omitted). Similarly, "[c]ontrol of the nature and scope of cross-examination of a witness is a matter within the sound discretion of the trial court." *Hamilton v. Shumpert*, 299 Ga. App. 137, 141 (2) (682 SE2d 159) (2009) (punctuation and footnote omitted). On appeal, therefore, we will not reverse a trial court's evidentiary ruling absent some evidence that the ruling constitutes an abuse of the court's considerable discretion. Id. See also *Grant v. State*, 289 Ga. App. 230, 232 (2) (656 SE2d 873) (2008).

(a) Hillman contends that the trial court should have sustained her objection to defense counsel's initial question to her son regarding his knowledge of RMG as a lien-based medical practice because that question assumed facts not in evidence and was beyond the scope of the witness's knowledge. At the hearing on Hillman's motion for a curative instruction, however, trial counsel stated that he was not objecting to defense counsel's questions regarding the lien-based medical practice, and conceded that defense counsel had a right to ask those questions. Accordingly, Hillman has waived this claim of error. See *Norman v. Ault*, 287 Ga. 324, 329 (3)

17

(695 SE2d 633) (2010) ("[a] litigant cannot submit to a ruling or acquiesce in the holding, and then complain of the same on appeal") (citation and punctuation omitted).

(b) Hillman further contends that the trial court erred in denying her motion for a curative instruction requiring the jury to disregard defense counsel's statements defining a lien-based medical practice. Such a curative instruction was required, Hillman argues, because defense counsel gave the definition and was for the improper purpose of showing that Hillman would not be required to pay RMG if she did not recover damages at trial. Moreover, there was no evidence either that Hillman was being treated on a lien basis or that RMG would not be paid if Hillman did not prevail.

Assuming arguendo that the trial court erred in denying the motion for curative instruction, however, such an error provides no basis for reversal. Erroneous evidentiary rulings are subject to the harmless error doctrine, meaning we may not reverse a judgment because of such an error "unless refusal to take such action appears to the court inconsistent with substantial justice." OCGA § 9-11-61. See also *Smith v. State*, 299 Ga. 424, 432 (2) (d) (788 SE2d 433) (2016) (error is harmless where the record shows "it is highly probable that the error did not contribute to the

18

verdict") (citation and punctuation omitted). And where the erroneously admitted evidence is cumulative of other, properly-admitted evidence, the error is considered harmless as a matter of law. See *Singleton v. State*, 326 Ga. App. 609, 611-612 (2) (a) (757 SE2d 211) (2014); *Ready Mix USA, Inc. v. Ross*, 314 Ga. App. 775, 781 (3) (726 SE2d 90) (2012); *DeGolyer v. Green Tree Servicing, LLC*, 291 Ga. App. 444, 450 (5) (a) (662 SE2d 141) (2008).

Here, Hillman is correct that at the time defense counsel explained a lien-based medical practice to Hillman's son, there was no evidence about what was meant by a "lien-based" practice or that RMG operated that type of practice. Such evidence was subsequently admitted, however, through the deposition of Dr. Malempati and the exhibits thereto. Additionally, one of those exhibits (introduced at trial as defendant's exhibit 44) showed that RMG was treating Hillman on a lien basis – i.e., that RMG had obtained (and subsequently sold) a lien against any monies Hillman might recover in her suit against ALDI. Accordingly, even if the trial court erred in refusing to give a curative instruction, that error does not entitle Hillman to a new trial. See *Ready Mix USA*, 314 Ga. App. at 781 (3).

2. In the consolidated pretrial order, the parties listed the documentary evidence each intended to offer at trial. Among the documents ALDI listed were the exhibits to Dr. Malempati's deposition. The pretrial order further provided, in relevant part:

> Unless noted, the parties have stipulated as to the authenticity of the documents listed and the exhibits listed may be admitted without further proof of authenticity. The parties reserve the right to object to the introduction of any evidence until a proper foundation has been made.

After presenting the video deposition testimony of Dr. Malempati, ALDI moved for the admission of defendant's exhibits 41 and 44, which had been introduced at Dr. Malempati's deposition as exhibits 2 and 9, respectively. Hillman objected to these exhibits on the grounds that ALDI had failed to lay a proper foundation for their introduction. Relying on the stipulation in the parties' pretrial order, the trial court overruled the objection and admitted the documents.[7] On appeal,

---

[7] The trial court also relied on the fact that Hillman had failed to object to the use of those documents at Dr. Malempati's deposition as grounds for admitting them at trial. Under Georgia law, however, "[o]bjections as to the competency and relevancy of the evidence need not be made at the taking of the depositions [that are used at trial]." *Thomas*, 321 Ga. App. at 459 (1) (c) (citation and punctuation omitted).

Hillman asserts that given the lack of evidentiary foundation, this ruling constitutes reversible error. We disagree.

Our cases show that "laying a foundation" for the admission of evidence can refer to one of two things. First, courts use the term to refer to a party's need to show that the evidence in question is relevant and/or necessary. See *Brewner v. State*, 302 Ga. 6, 17 (V) (804 SE2d 94) (2017) ("[t]he failure of a witness to remember making a statement may provide the foundation for offering extrinsic evidence to prove that the statement was made"); *Hood v. State*, 299 Ga. 95, 99 (2) (786 SE2d 648) (2016) (same). Second, courts may use the phrase "laying a proper foundation" to refer to the proof required as to "the authenticity or genuineness of [a] writing." *Hollie v. State*, 298 Ga. App. 1, 2-3 (1) (679 SE2d 47) (2009). See also *In the Interest of L. P.*, 324 Ga. App. 78, 81-82 (2) (749 SE2d 389) (2013) (equating laying a proper foundation for the admission of "[d]ocuments from electronic sources, such as the printouts from a website" with authenticating those documents).

Here, the parties' pretrial order relieved them from having to present any evidence that might otherwise be required to authenticate their evidentiary documents. Given that fact, we conclude that the parties intended the phrase "proper foundation," as used in the pretrial order, to refer to the requirement that to be

21

admissible, a party must show that the evidence is relevant and/or necessary. Hillman's brief, however, makes clear that she objected to defendant's exhibits 41 and 44 on the grounds that they had not been properly authenticated. Given that she had stipulated to the authenticity of these documents in the pretrial order, however, the trial court did not err in admitting the exhibits over her objection. See *Sherman & Hemstreet, Inc. v. Cincinnati Ins. Co.*, 277 Ga. 734, 736 (2) (594 SE2d 648) (2004) (parties are bound by their stipulations); *In the Interest of R. J. M.*, 295 Ga. App. 886, 891 (2) (673 SE2d 527) (2009) ("[a] stipulation operates as an admission in judicio and is conclusive and binding upon the party making the stipulation") (citation and punctuation omitted).

3. During cross-examination of the ALDI store manager, Hillman's attorney asked the following question: "Do you have any reason to believe anybody but an ALDI employee stacked [the] boxes [that fell on Hillman] on the floor?" ALDI's counsel objected to the question, arguing that it called for speculation, and the trial court sustained the objection. Hillman contends that this ruling constituted an abuse of the trial court's discretion, as it interfered with Hillman's right to conduct a thorough cross-examination. Assuming arguendo that the question should have been

22

allowed, however, Hillman cannot show that she suffered harm as a result of this ruling.

On appeal, Hillman asserts that the question was designed to help her establish a critical element of her case, namely that it was an ALDI employee who stacked or placed the boxes that fell and injured Hillman. The store manager's testimony on direct examination, however, established that it was an ALDI employee who had placed the boxes in question. Specifically, the manager testified that the boxes were placed on the floor by an ALDI employee who was restocking the produce section. Given the lack of harm resulting from this claimed error, it provides no basis for granting Hillman a new trial. See *Sasser v. Adkinson*, 258 Ga. App. 699, 699 (574 SE2d 907) (2002) (because an "[a]ppellant is required to show harm as well as error to prevail on appeal[,]" "a case will not be reversed merely because error may have occurred") (citation and punctuation omitted).

4. Hillman contends that the trial court erred in refusing to allow her attorney to assert, during closing argument, that ALDI had spoliated evidence either by deliberately destroying videotape of the incident or by failing to preserve the video. In support of this argument, Hillman relies on the rule that counsel may argue deductions or inferences that can be drawn from the evidence presented at trial. See

*Chrysler Group, LLC v. Walden*, 339 Ga. App. 733, 744 (5) (792 SE2d 754) (2016). She then reasons that the evidence (showing that the videotape existed and had been forwarded to counsel for ALDI but had not been produced prior to trial) supported the inference that ALDI had spoliated this evidence. We find this argument unpersuasive.

Although "[c]ounsel is permitted wide latitude in closing argument," the trial court has the discretion to "define[] the bounds of such argument." *Hamilton*, 299 Ga. App. at 142-143 (3). And no abuse of discretion occurs where the trial court prevents counsel from "injecting into a case, by way of closing argument, facts not in the record and calculated to prejudice the opposing party." Id. at 143 (3).

"Spoliation refers to the destruction or failure to preserve evidence that is necessary to contemplated or pending litigation." *Bouve & Mohr, LLC v. Banks*, 274 Ga. App. 758, 762 (1) (618 SE2d 650) (2005) (citation, punctuation, and footnote omitted). Despite Hillman's arguments to the contrary, our precedent makes clear that spoliation of evidence is not a fact the jury is empowered to find by inference. Instead, whether spoliation occurred is a question of fact, to be decided by the court prior to trial. *Demere Marsh Assoc., LLC v. Boatright Roofing & Gen. Contracting*, 343 Ga. App. 235, 248 (4) (808 SE2d 1) (2017) ("[w]e reiterate that it is the duty of

24

the trial court – and not the jury – to make factual findings about whether spoliation occurred") (citation and punctuation omitted). And if the court finds that spoliation has occurred, it then determines whether the jury will be informed of that fact, as the court is "authorized to craft a solution that fits the facts[,] including . . . charging the jury that spoliation of evidence creates the rebuttable presumption that the evidence would have been harmful to the spoliator." Id. (citation and punctuation omitted). Thus, if Hillman suspected spoliation, she was obligated to obtain a ruling on that issue prior to closing argument and then request an appropriate jury instruction. In the absence of a finding by the trial court that spoliation had occurred, however, Hillman could not argue spoliation to the jury, and the trial court did not err in preventing her attorney from doing so.

*A18A1672*

5. In Case No. A18A1672, Hillman appeals the trial court's judgment of contempt entered against her attorney, arguing that the finding of contempt is not supported by the findings contained in the trial court's order or by the evidence of record. We agree that as written, the contempt order does not contain the requisite findings of fact necessary to support a finding of contempt. Nor does that order apply the correct evidentiary standard.

25

Direct, criminal contempt of court occurs where the contemptuous conduct takes place in the court's presence.[8] *In re Hughes*, 299 Ga. App. 66, 72 (2) (681 SE2d 745) (2009). When such contemptuous conduct occurs during trial, a trial judge has the authority "after affording the contemnor an opportunity to speak in his or her own behalf, to announce punishment summarily and without further notice or hearing." *In re Sprayberry*, 334 Ga. App. 571, 572 (779 SE2d 732) (2015) (citation, punctuation, and emphasis omitted). Summary proceedings in this context are allowed because contumacious conduct at trial "threatens a court's immediate ability to conduct its proceedings" and the court therefore has a "substantial interest in rapidly coercing compliance and restoring order." *In re Hughes*, 299 Ga. App. at 72 (2) (citation and punctuation omitted).

Such a summary finding of criminal contempt against an attorney who is advocating on behalf of a client, however, must be supported by findings that: (1)

---

[8] "Criminal contempt involve some form of wilful disrespect toward the court; it may involve intentional disregard for or disobedience of an order or command of the court, or it may involve conduct which interferes with the court's ability to administer justice." *In re Schoolcraft*, 274 Ga. App. 271, 274 (2) (617 SE2d 241) (2005) (citation and punctuation omitted). Thus, "criminal contempt imposes unconditional punishment for prior acts of contumacy," as opposed to civil contempt, which "imposes conditional punishment as a means of coercing future compliance with a prior court order." *Murtagh v. Emory University*, 321 Ga. App. 411, 415 (2) (741 SE2d 212) (2013) (citation and punctuation omitted).

26

"the attorney's statements and attendant conduct either actually interfered with or posed an imminent threat of interfering with the administration of justice"; and (2) "the attorney knew or should have known that the statements and attendant conduct exceeded the outermost bounds of permissible advocacy."[9] *In re Jefferson*, 283 Ga. at 220. Furthermore, "[b]ecause contempt is a crime, the evidence must . . . support these findings beyond a reasonable doubt." Id.

---

[9] The *Jefferson* court further noted that in determining whether the evidence supports either of these findings beyond a reasonable doubt,

> it may be helpful for the court to consider the following non-exhaustive list of factors: (1) the extent to which the attorney was put on notice prior to the contempt citation that a continuation of the offending statements would constitute contempt; (2) the likely impact of the offending statements on the deliberations of the factfinder, which calculus incorporates both the nature and timing of the offending conduct and whether the factfinder is a judge or jury; (3) whether the offending statements occurred as an isolated incident or constituted a pattern of behavior; (4) the significance of the particular issue in question to the case as a whole and the relative gravity of the case; and (5) the extent, if any, to which the trial court provoked the offending statements with its own improper statements.

283 Ga. at 220.

Here, the contempt order reflects that the court failed to apply the correct evidentiary standard. Specifically, the order states the trial court's belief that because the contempt occurred in the court's presence, it was not required to apply "any evidentiary standard of proof" before finding Hillman's attorney in contempt. Moreover, the contempt order contains no findings as to whether the attorney's conduct in this case interfered with or posed a threat to the administration of justice or whether the attorney was on notice that his comments "exceeded the outermost bounds of permissible advocacy."[10] The trial court, however, was obligated to make such findings. And it is the trial court, who was present for the discussion that preceded the finding of contempt, that is best situated to determine whether the evidence showed both of these elements beyond a reasonable doubt. Accordingly, we vacate the contempt order and remand for reconsideration by the trial court and, if warranted, entry of a new order of contempt that satisfies the requirements articulated by our Supreme Court.

---

[10] The only factual finding made by the court to support its finding of contempt is that the attorney's conduct constituted a willful violation of the court's previous admonition to the attorney to refrain from suggesting that ALDI had deliberately destroyed the videotape in question.

28

For the reasons set forth above, we affirm the order of judgment in Case No. A18A1673. We vacate the order of contempt in Case No. A18A1672 and remand for entry of a new order of contempt, should the trial court find that such an order is warranted under the applicable legal standard.

*Judgment affirmed in Case No. A18A1673 and judgment vacated and case remanded in Case No. A18A1672. Coomer and Hodges, JJ., concur.*